**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

ARISTA RECORDS LLC, ATLANTIC
RECORDING CORPORATION, CAPITOL
RECORDS, LLC, ELEKTRA ENTERTAINMENT
GROUP INC., LAFACE RECORDS LLC, SONY
MUSIC ENTERTAINMENT, UMG RECORDINGS,
INC., WARNER BROS. RECORDS INC., WARNER
MUSIC GROUP CORP., and
ZOMBA RECORDING LLC,

       *Plaintiffs*,

       v.

VITA TKACH, and DOES 1-10, D/B/A
GROOVESHARK.IO and GROOVESHARK.PW,

       *Defendants*.

CIVIL ACTION NO. _____

**COMPLAINT**

**[FILED UNDER SEAL
PURSUANT TO
15 U.S.C. §1116]**

---

Plaintiffs, by and through their counsel, on personal knowledge as to their own actions

and on information and belief as to the actions, capabilities and motivation of others, hereby

allege the following:

**<u>INTRODUCTION</u>**

1.     Plaintiffs are record companies that produce, manufacture, distribute, sell and

license the great majority of all legitimate commercial sound recordings in this country.  This

case arises from the egregious and bad faith counterfeiting, cybersquatting and copyright

infringement by rogue Internet website operators who have launched a "copycat" of the well-

known "Grooveshark" music streaming service, accessible at their newly-created website

grooveshark.io (the "Counterfeit Service").  Defendants have admittedly launched this new

service to sow confusion in the marketplace and to frustrate Plaintiffs' multi-year enforcement

efforts against the former operators of Grooveshark, which culminated in the entry of *three*

consent judgments and permanent injunctions within the past ten days, including by two Courts within this District.

2.      Escape Media Group, Inc. ("Escape"), is the former owner and operator of the eponymous music streaming service known as "Grooveshark," previously accessible at the website grooveshark.com.  From at least as early as 2007 until April 30, 2015, Escape's Grooveshark service offered visitors the ability to stream music directly from the Grooveshark website to their personal computers or other compatible devices.  The Grooveshark service was extremely popular, boasting as many as 35 million monthly users at its peak.  For the vast majority of music that it provided through the Grooveshark service, however, Escape did not have licenses from Plaintiffs and other copyright owners.

3.      Plaintiffs filed and prosecuted a series of high-profile copyright infringement actions against Escape based on various aspects of its operation of the Grooveshark service. *UMG Recordings, Inc. Escape Media Group, Inc.*, No. 100152/10, Complaint (N.Y. Sup. Ct. Jan. 6, 2010); *Arista Music, et al. v. Escape Media Group, Inc.* ("*Arista Music*"), No. 11 Civ. 8407, Complaint, Dkt. No. 3 (S.D.N.Y. Dec. 18, 2011); *Capitol Records, LLC, d/b/a EMI Music North America* ("*EMI*"), No. 12-CV-6646 (AJN), Complaint, Dkt. No. 1 (S.D.N.Y. Aug. 30, 2012).

4.      Within the past nine months, the courts in *Arista Music* and *EMI* (both in this District) granted summary judgment in favor of Plaintiffs against Escape based on its infringement of Plaintiffs' copyrighted works.  *Arista Music*, No. 11 Civ. 8407 (TPG), 2014 WL 5089743 (Sept. 29, 2014); *EMI*, No. 12-CV-6646 (AJN), 2015 WL 1402049 (Mar. 25, 2015).

5.      On April 30, 2015, on the eve of a statutory damages trial in the *Arista Music* action, Escape suspended its operation of the Grooveshark service and assigned its intellectual property, including, but not limited to, the word mark "Grooveshark" and the shark fin logo

design featured on the Grooveshark.com website (hereinafter "Grooveshark Marks") to Plaintiff

UMG Recordings, Inc. ("UMG") as part of a settlement with all Plaintiffs.  On that same date,

Escape and Plaintiffs submitted consent judgments in all three cases providing for permanent

injunctive relief against Escape and, in two of the cases, awarding Plaintiffs monetary damages

of $50 million dollars (in the *Arista Music* case) and $25 million dollars (in the *EMI* case).  The

courts entered all three judgments shortly thereafter.  *Arista Music*, No. 11 Civ. 8407 (TPG),

Dkt. No. 175 (May 1, 2015); *UMG v. Escape*, No. 100152/10, Dkt. No. 269 (May 4, 2015); *EMI*,

No. 12-CV-6646 (AJN), Dkt. No. 108 (May 5, 2015).

6.     Plaintiffs' actions against Escape in connection with the Grooveshark service

have received widespread media coverage in various national news outlets, including *The New

York Times*, *The Washington Post*, and *The Los Angeles Times*.  *See e.g.,* Exhibit A.

7.     On May 5, 2010, Defendants launched their Counterfeit Service at the web

address "grooveshark.io," which allows users to download and stream infringing copies of

Plaintiffs' sound recordings directly from servers operated or controlled by Defendants, in

flagrant violation of Plaintiffs' copyrights.  Defendants also registered the web address

grooveshark.pw, which automatically redirects Internet traffic to the Grooveshark.io website.

8.     Defendants' Counterfeit Service is a blatant "clone" of the original Grooveshark

website and service that is designed and intended to mislead and confuse consumers regarding

the source, sponsorship and affiliation of the service.  The Counterfeit Service features

counterfeit replicas of the Grooveshark Marks as well as identical graphical elements taken from

the Grooveshark.com website.  A screen shot from the Counterfeit Service (Figure A) compared

to a screen shot from a previous version of Escape's Grooveshark.com website (Figure B) is

shown below:

*Figure A.  The Counterfeit Service:*



*Figure B.  The original Grooveshark music service:*



9.      In furtherance of their unlawful scheme, Defendants have contacted various U.S.-based media outlets using the aliases "New Grooveshark" and "Shark" to boast about their efforts to resurrect and copy the Grooveshark service.  In various articles, the operators of the Counterfeit Service admitted their bad faith, stating, for example, that they copied the Grooveshark website "[b]ecause YES, we can. And we want to.  Simple as that."  *See* Exhibit B

(Mario Aguilar, <u>Grooveshark Defiantly Resurrected By a Rogue Pirate</u>, Gizmodo.com (May 5, 2015, 5:35 PM)).  Acknowledging the illegality of their conduct and the likelihood of copyright enforcement efforts against them, Defendants asserted that "[i]t's going to be a roller coaster, and we're ready for it."  *See* Exhibit C (Jacob Siegal, <u>Days after its demise, Grooveshark is back</u>, BGR.com (May 5, 2015, 11:54 AM)).

10.     Defendants' use of the Grooveshark Marks on or in connection with the Counterfeit Service is likely to cause and has caused actual confusion and mistake by and among consumers and has irrevocably harmed and will continue to harm UMG's rights in and to the Grooveshark Marks.

11.     Defendants have registered and are using the Internet domain names "Grooveshark.io" and "Grooveshark.pw" with a bad-faith intent to profit from the Grooveshark Marks; namely, by tricking consumers into believing that Defendants' Counterfeit Service is the same service as Grooveshark.com.

12.     Defendants are also engaged in the unauthorized reproduction, distribution, and public performance of Plaintiffs' sound recordings via the Counterfeit Service, on a massive scale.  The harm to Plaintiffs, who invest millions of dollars and enormous creative energies to produce their creative copyrighted works, is manifest and irreparable.

## NATURE OF THE ACTION

13.     This is a civil action seeking equitable relief and damages for counterfeiting, trademark infringement and cybersquatting under the Lanham Act, 15 U.S.C. §§ 1051 *et seq*., and for copyright infringement under the Copyright Act of 1976, 17 U.S.C. §§ 101 *et seq*.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over the Lanham Act claims pursuant to 28 U.S.C. §§ 1331 and 1338(a), and 15 U.S.C. §§ 1116 and 1121.

15.     This Court has jurisdiction over the Copyright Act claims pursuant to 28 U.S.C. §§ 1331 and 1338(a), and 17 U.S.C. § 502.

16.     Defendants are subject to the jurisdiction of this Court pursuant to N.Y.C.P.L.R. § 302(a)(3)(ii) because (1) they committed numerous tortious acts outside New York, including by infringing the Grooveshark Marks and by reproducing, distributing and performing infringing copies of Plaintiffs' sound recordings; (2) the causes of action arose from those acts; (3) the tortious acts caused an injury to Plaintiffs, who maintain either headquarters or offices in New York; (4) in light of the well-publicized consent judgments entered by courts in New York, and New York's status as the hub of the recording industry, Defendants not only expected or should have reasonably expected their acts to have consequences in New York, but specifically intended to harm Plaintiffs in New York and to frustrate the provisions set forth in the consent judgments against the former operators of the Grooveshark service; and (5) upon information and belief, Defendants have derived substantial revenue from interstate or international commerce.

17.     Defendants are also subject to the jurisdiction of this Court pursuant to Fed. R. Civ. P. 4(k)(2).  Defendants have targeted their infringing site to a U.S. audience, they have marketed it to millions of U.S. users, and they have entered into various agreements with third parties in the U.S. in further of their unlawful activities, including domain name registrars and Internet Service Providers.

18.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), (c) and (d) and/or 28 U.S.C. § 1400(a) in that the Defendants are entities or individuals subject to personal jurisdiction in this District.  Defendants are not, on information and belief, residents of the United States.

## THE PARTIES

**Plaintiffs**

19.     Plaintiffs are in the business of producing, manufacturing, distributing, selling, licensing, and facilitating the distribution, sale, public performance, and other authorized uses of sound recordings (*i.e.*, recorded music) in the United States.  The considerable artistic and technical quality of Plaintiffs' sound recordings is well-known in New York, and throughout the United States and the world.

20.     Plaintiff Arista Records LLC, is a Delaware limited liability company with its principal place of business in New York, New York.

21.     Plaintiff Atlantic Recording Corporation is a Delaware corporation with its principal place of business in New York, New York.

22.     Plaintiff Capitol Records, LLC is a Delaware limited liability company with its principal place of business in California.  Capitol Records, LLC is registered to do business in New York and maintains an office in New York, New York.

23.     Plaintiff Elektra Entertainment Group Inc. is a Delaware corporation with its principal place of business in New York, New York.

24.     Plaintiff LaFace Records LLC is a Delaware limited liability company with its principal place of business in New York, New York.

25.     Plaintiff Sony Music Entertainment is a Delaware partnership with its principal place of business in New York, New York.

26.     Plaintiff UMG Recordings, Inc. ("UMG") is a Delaware corporation with its principal place of business in Santa Monica, California.  UMG is registered to do business in New York and maintains an office in New York, New York.

27.     Plaintiff Warner Bros. Records Inc. is a Delaware corporation with its principal place of business in Burbank, California.   Warner Bros. Records Inc. is registered to do business in New York and maintains an office in New York, New York

28.     Plaintiff Warner Music Group Corp. is a Delaware corporation with its principal place of business in New York, New York.

29.     Plaintiff Zomba Recording LLC is a Delaware limited liability company with its principal place of business in New York, New York.

**Plaintiff UMG's Grooveshark Marks and Logo**

30.     UMG is the owner by assignment from Escape of the entire right, title and interest in and to, *inter alia*, of the Grooveshark Marks, which are federally-registered trademarks. Information from those registrations, copies of which (as they appear on the U.S. Patent and Trademark Office website) are attached hereto as Exhibit D, is summarized below:

| Registration No. | Trademark | Good and Services |
|---|---|---|
| 4114779 | GROOVESHARK | Entertainment marketing services, namely, marketing, promotion and advertising for recording and performing artists.  Audio broadcasting; Internet radio broadcasting services; broadcasting of audio programming over the Internet.  Entertainment services via the Internet, namely, providing nondownloadable prerecorded music, providing nondownloadable prerecorded music according to consumer preferences, and providing information in the field of music. |
| 4114780 |  | Same as above. |

31.     The registrations listed above are valid, subsisting, unrevoked and uncancelled and UMG is the owner of these marks and all the goodwill associated therewith.  *See id.*.

32.     The Grooveshark Marks are well-known and have been widely and extensively used and promoted in interstate commerce on or in connection with the music streaming services offered by Escape.  As such, the public and relevant consumers have come to recognize the

Grooveshark Marks as identifying a single source of services (*i.e.,* the Grooveshark service), marks that are now owned by UMG.

**Plaintiffs' Copyrighted Sound Recordings**

33.     Plaintiffs are the copyright owners or owners of exclusive rights with respect to the majority of copyrighted sound recordings sold in the United States, including sound recordings containing the performances of some of the most popular and successful recording artists of all time, such as Beyoncé, Bob Marley, Green Day, Justin Timberlake, Kanye West, Lady Gaga, Michael Jackson, the Red Hot Chili Peppers, Santana, and many more.  Plaintiffs have invested and continue to invest significant money, time, effort, and creative talent to create, promote, sell, and license their sound recordings.

34.     Plaintiffs distribute, sell, and/or license their sound recordings in the form of CDs and other tangible media throughout the United States, including in New York.  Plaintiffs also sell, distribute, publicly perform, and/or license their sound recordings in the form of digital audio files through legitimate and authorized Internet services, such as iTunes, Amazon, Beats Music, Rhapsody and Spotify, which are available throughout the United States, including in New York.

35.     Under the Copyright Act, Plaintiffs have the exclusive rights, among other things, to "reproduce the copyrighted work[s]" to "distribute copies or phonorecords of the copyrighted work[s] to the public," to "perform the copyrighted work[s] publicly by means of a digital audio transmission," as well as to authorize or license such activities. 17 U.S.C. § 106.

36.     A non-exhaustive, illustrative list of Plaintiffs' federally copyrighted sound recordings that Defendants have illegally reproduced, distributed and/or performed to their users is attached hereto as Exhibit E.  Each Plaintiff has received Certificates of Copyright Registration from the Register of Copyrights for these copyrighted sound recordings.

**Defendants**

37.     On information and belief, Defendants reside in and operate the Counterfeit Service from unknown locations outside the United States.

38.     On or about May 2, 2015, Defendants obtained a registration for the domain name "grooveshark.io."  The relevant registration record indicates that Defendants registered the "grooveshark.io" domain name through the services of Namecheap, Inc., a domain name registrar based in Los Angeles, California.  *See* Exhibit F (registration record for grooveshark.io).  The .io domain is administered by NIC.io, which is operated by Internet Computer Bureau, a provider of domain name services based in the United Kingdom.

39.     Also on or about May 2, 2015, Defendants obtained a registration for the domain name "grooveshark.pw."  The relevant registration record indicates that Defendants, using a Panamian entity called "WhoisGuard" as the registrant, also registered the "grooveshark.pw" domain name through the services of Namecheap, Inc.  *See* Exhibit G (registration record for grooveshark.pw).  The .pw domain is administered by the .PW Registry, which is controlled by the Directi Group, a business organization with offices in India, China, and the United Arab Emirates.

40.     The registration record for grooveshark.io lists Defendant "Vita Tkach" as the Domain Owner, Admin Contact, Technical Contact, and Billing Contact with an address in the city of Vinnytsia in the Ukraine.  Exhibit G.

41.     Does 1-10 are individuals who, along with Vita Tkach, own and/or operate the Counterfeit Service, but whose identities and addresses are currently unknown to Plaintiffs.

**The Counterfeit Service**

42.     Defendants launched the Counterfeit Service within days after the press coverage announcing the cessation of Escape's operation of the Grooveshark service and the assignment

of its intellectual property to Plaintiff UMG as part of a settlement between Escape and all Plaintiffs.  *Supra* at ¶¶ 5, 6, 38.

43.     In an attempt to create confusion and pass off their service as the same service previously offered under the Grooveshark Marks, Defendants' Counterfeit Service prominently features counterfeit copies of the Grooveshark Marks and bears the same graphic designs and overall appearance and colors as an earlier version of the Grooveshark.com website operated by Escape.  *See supra* at ¶ 8.

44.     In a further attempt to mislead the public, Defendants have caused descriptions of their infringing service to appear on popular search engines that explicitly make the false and misleading claim that the Counterfeit Service is the "New Grooveshark.com."  *See* Exhibit H (Google and Bing search results for, respectively, the terms "Grooveshark" and "Grooveshark.io").

45.     Additionally, as part of their above-mentioned press campaign, *supra* ¶ 9, Defendants have claimed an affiliation with Escape.  Defendants' apparent representative "Shark" has told the media that he or she "was connected to Grooveshark a few years back." Exhibit I.

46.     Defendants also claim to have the technical capability to restore the Grooveshark service as it existed before Escape ceased its operations.  "Shark" has told the media that "I have, together with the team I've gathered, the knowledge and the technological abilities to bring it back to life."  *Id.*  Defendants claim to have copied "90%" of the contents of the Grooveshark service in anticipation of the shutdown of the service following the courts' entry of consent judgments against Escape in the actions noted above.  *See* Exhibit C.

47.     Despite Defendants' claim to have resurrected the old Grooveshark service, the Counterfeit Service is, upon information and belief, merely a rebranding of an already-existing

pirate music site, which Defendants are seeking to promote through the unauthorized use of the

Grooveshark Marks.  As one media outlet observed, "[t]he [Grooveshark.io] site appears to be a

rebranding of mp3juices.se, another music piracy site. . . suggesting that Shark may instead be

using the Grooveshark name to bring attention to mp3juices."  *See* Exhibit I.

48.     These efforts have succeeded in causing actual confusion among Internet users.

A selection of recent posts from Twitter.com shows that users were misled into believing, *inter

alia*, that "Grooveshark is back, and how!" "Grooveshark is back from the dead," "someone

revived the recently defunct Grooveshark," "Grooveshark is back up through Grooveshark_io,"

and "someone resurrected Grooveshark."  *See* Exhibit J.

**Functionality of the Counterfeit Service**

49.     The Counterfeit Service hosts a vast number of MP3 music files (a popular format

for digital music files).  Defendants announce to search engines that "GrooveShark.io is a web-

based music application built for anyone on the internet to listen to music on-demand at no

charge, New Grooveshark.com."  *See* Exhibit H.

50.     Users who visit the Counterfeit Service can locate these MP3 files with a search

box, copied from the Grooveshark website, which is prominently displayed to the user.  Most, if

not all, of the accessible files are typically copyrighted sound recordings.

51.     After a user enters a search query, the Counterfeit Service directs users to search

result pages, which contain links to MP3 files located on Defendants' servers.  This process

enables users to reproduce or perform the song embodied in each MP3 file.  Each search result

on a search result page contains two types of icons:  (a) a "download" icon, which enables users

to download a new copy of the MP3 file, and a "play" icon, which opens a small in-page player

and begins playing the song.

52.     The Counterfeit Service's collection of MP3 files is vast and contains an enormous number of Plaintiffs' copyrighted works.  With only a few keystrokes, users can quickly and easily find, and then reproduce or perform, full-length infringing copies of legendary sound recordings like Michael Jackson's "Billie Jean," Green Day's "American Idiot," and Lady Gaga's "Born This Way," to name just a few.

53.     As a direct result of Defendants' widespread and brazen infringement of the Grooveshark Marks and Plaintiffs' copyrighted works, the Counterfeit Service threatens to pick up where Escape's original Grooveshark service left off.  Escape's service was one of the most popular music streaming sites on the Internet, attracting up to 35 million monthly users during its nine years of operation and generating significant revenue.

54.     Independent studies estimate that the Counterfeit Service has already attracted roughly 180,000 unique visitors from the United States in its first *6 days* of existence.  *See* Exhibit K (May 8, 2015 printout from TrafficEstimate.com showing Grooveshark.io's user traffic).

55.     As another indicator of the growing popularity of the Counterfeit Service, Grooveshark.io is already the top search return on Google in response to a query for "Grooveshark," even though the Counterfeit Service has existed for *only a week*.  *Id.*, Ex. H (Google results, at 1).

56.     This growing popularity of the Counterfeit Service will enable Defendants to enrich themselves at the expense of copyright owners, like Plaintiffs, whose sound recordings are pirated on an immense scale on the Counterfeit Service on a daily basis.

## COUNT ONE

### TRADEMARK COUNTERFEITING AND INFRINGEMENT
**15 U.S.C. § 1114**
**(On Behalf of Plaintiff UMG)**

57.     UMG repeats and realleges every allegation contained in paragraphs 1 through 56 as if fully set forth herein.

58.     The Grooveshark Marks are valuable and distinctive.  Moreover, the Grooveshark Marks are valid and protectable, *see* Exhibit D, and UMG is the owner of these marks and all the goodwill associated therewith.

59.     Defendants are using counterfeit copies and confusingly similar imitations of the Grooveshark Marks in commerce in connection with the promotion, advertisement and operation of the Counterfeit Service and their music download and streaming service.  Moreover, Defendants have intentionally sought to mislead consumers by falsely referring to their service as "the new Grooveshark.com."

60.     Defendants' use of counterfeit copies and confusingly similar imitations of the Grooveshark Marks is likely to cause and has caused actual confusion, mistake and deception among the relevant consumers and as to the source, sponsorship or affiliation of the services provided by Defendants via their Counterfeit Service.

61.     Defendants' unlawful actions have individually and jointly caused and are continuing to cause unquantifiable and irreparable harm to UMG.

62.     Defendants' above-described illegal actions constitute counterfeiting and infringement of the Grooveshark Marks in violation of UMG's rights under Section 32 of the Lanham Act, 15 U.S.C. § 1114.

63.     UMG has no adequate remedy at law and, if Defendants' activities are not preliminarily and permanently enjoined, UMG will continue to suffer irreparable harm and injury.

## COUNT TWO

**UNFAIR COMPETITION AND FALSE DESIGNATION OF ORIGIN**
**15 U.S.C. §1125(a)**

**(On Behalf of Plaintiff UMG)**

64.     UMG repeats and realleges every allegation contained in paragraphs 1 through 63 as if fully set forth herein.

65.     Defendants' Counterfeit Service features counterfeit copies of UMG's Grooveshark Marks and is otherwise highly similar in appearance to the former Grooveshark website.  Accordingly, Defendants' activities are likely to cause and have caused actual confusion among consumers as to the origin or sponsorship of Defendants' service.

66.     By misappropriating and using UMG's Grooveshark Marks, Defendants misrepresent and falsely describe to the general public the origin and source of their service and create a likelihood of confusion by consumers as to the source of such service.

67.     Defendants' infringing acts, as described above, are in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1 125(a), in that Defendants' use of the Grooveshark Marks in connection with their Counterfeit Service in commerce constitutes a false designation of origin and unfair competition.

68.     UMG has no adequate remedy at law and, if Defendants' activities are not preliminarily and permanently enjoined, UMG will continue to suffer irreparable harm and injury.

## COUNT THREE

**CYBERSQUATTING UNDER THE
ANTICYBERSQUATTING CONSUMER PROTECTION ACT
15 U.S.C. §1125(d)**

**(On Behalf of Plaintiff UMG)**

69.     UMG repeats and realleges every allegation contained in paragraphs 1 through 68 as if fully set forth herein.

70.     The domain names "grooveshark.io" and "grooveshark.pw" are identical or confusingly similar UMG's registered "Grooveshark" word mark, which was distinctive and/or famous at the time Defendants registered the domain name.

71.     Defendants have acted with a bad-faith intent to profit from the "Grooveshark" word mark and the goodwill associated with it by registering and using the domain names grooveshark.io and grooveshark.pw.

72.     Defendants' activities as alleged herein violate the federal Anticybersquatting Consumer Protection Act, 15 U.S.C. § l 125(d)(l).

73.     UMG has no adequate remedy at law and, if Defendants' activities are not preliminarily and permanently enjoined, UMG will continue to suffer irreparable harm and injury.

## COUNT FOUR

**DIRECT COPYRIGHT INFRINGEMENT
(On Behalf of All Plaintiffs)**

74.     Plaintiffs repeat and reallege every allegation contained in paragraphs 1 through 73 as if fully set forth herein.

75.     Defendants, without permission or consent of Plaintiffs, reproduce and distribute unauthorized reproductions of Plaintiffs' copyrighted sound recordings, and engage in unauthorized public performances of copyrighted sound recordings, including but not limited to

those copyrighted sound recordings listed in Exhibit F hereto.  Such reproduction, distribution, and public performance constitutes infringement of Plaintiffs' registered copyrights and the exclusive rights under copyright in violation of 17 U.S.C. § 106(1), (3) and (6).

76.     The infringement of Plaintiffs' rights in each of their copyrighted sound recordings constitutes a separate and distinct act of infringement.

77.     Defendants' acts of infringement are willful, intentional, and purposeful, in disregard of and indifferent to the rights of Plaintiffs.

78.     As a direct and proximate result of Defendants' infringement of Plaintiffs' copyrights and exclusive rights under copyright, Plaintiffs are entitled to the maximum statutory damages, pursuant to 17 U.S.C. § 504(c), in the amount of $150,000 with respect to each work infringed, or such other amounts as may be proper under 17 U.S.C. § 504(c).  In the alternative, at Plaintiffs' election pursuant to 17 U.S.C. § 504(b), Plaintiffs are entitled to their actual damages, including Defendants' profits from infringement, in amounts to be proven at trial.

79.     Plaintiffs are entitled to their costs, including reasonable attorneys' fees, pursuant to 17 U.S.C. § 505.

80.     Defendants' conduct is causing, and, unless enjoined by this Court, will continue to cause Plaintiffs great and irreparable injury that cannot fully be compensated or measured in money.  Plaintiffs have no adequate remedy at law.  Pursuant to 17 U.S.C. § 502, Plaintiffs are entitled to a preliminary injunction and a permanent injunction prohibiting infringement of Plaintiffs' copyrights and exclusive rights under copyright.

## COUNT FIVE

### SECONDARY COPYRIGHT INFRINGEMENT
**(On Behalf of All Plaintiffs)**

81.     Plaintiffs repeat and reallege every allegation contained in paragraphs 1 through 80 as if fully set forth herein.

82.     As detailed above, users of the Counterfeit Service are engaged in repeated and pervasive infringement of Plaintiffs' exclusive rights by downloading copies of MP3 files for Plaintiffs' copyrighted works to their personal computers or other devices from the Counterfeit Service.

83.     Defendants are liable under the Copyright Act for inducing these infringing acts of the users of the Counterfeit Service.  Defendants operate the Counterfeit Service with the object of promoting its use to infringe Plaintiffs' copyrights.

84.     Defendants knowingly and intentionally induce, entice, persuade, and cause users of the Counterfeit Service to infringe Plaintiffs' copyrights in their sound recordings, including but not limited to those sound recordings listed in Exhibit E hereto, in violation of Plaintiffs' copyrights.  Defendants specifically invite users "to listen to music on-demand at no charge" and provide prominent download buttons adjacent to the search results that allow users to create permanent, unauthorized copies of infringing music with ease.

85.     Through these activities, among others, Defendants knowingly and intentionally take steps that are substantially certain to result in direct infringement of Plaintiffs' sound recordings, including but not limited to those sound recordings listed in Exhibit E hereto, in violation of Plaintiffs' copyrights.

86.     Despite their knowledge that infringing material is made available to users by means of the Counterfeit Service, Defendants have failed to take reasonable steps to minimize the infringing capabilities of the website.

87.     Defendants are liable as contributory copyright infringers for the infringing acts of users of the Counterfeit Service.  Defendants have actual and constructive knowledge of this infringing activity.  Defendants knowingly cause and otherwise materially contribute to these

unauthorized reproductions of Plaintiffs' copyrighted sound recordings, including but not limited to those sound recordings listed in Exhibit E hereto.

88.     Defendants are vicariously liable for the infringing acts of users of the Counterfeit Service.  Defendants have the right and ability to supervise and control the infringing activities that occur through the use of their website, and at all relevant times have derived a direct financial benefit from the infringement of Plaintiffs' copyrights.  Defendants have refused to take any meaningful action to prevent the widespread infringement by its users. Defendants are therefore vicariously liable for the unauthorized reproduction of Plaintiffs' copyrighted sound recordings by their users, including but not limited to those sound recordings listed in Exhibit E hereto.

89.     The infringement of Plaintiffs' rights in each of their copyrighted sound recordings constitutes a separate and distinct act of infringement.

90.     Defendants' acts of infringement are willful, intentional and purposeful, in disregard of and indifferent to the rights of Plaintiffs.

91.     As a direct and proximate result of Defendants' infringement of Plaintiff copyrights and exclusive rights under copyright, Plaintiffs are entitled to the maximum statutory damages, pursuant to 17 U.S.C. § 504(c), in the amount of $150,000 with respect to each work infringed, or such other amounts as may be proper under 17 U.S.C. § 504(c).  In the alternative, at Plaintiffs' election pursuant to 17 U.S.C. § 504(b), Plaintiffs are entitled to their actual damages, including Defendants' profits from infringement, in amounts to be proven at trial.

92.     Plaintiffs are entitled to their costs, including reasonable attorneys' fees, pursuant to 17 U.S.C. § 505.

93.     Defendants' conduct is causing, and, unless enjoined by this Court, will continue to cause Plaintiffs great and irreparable injury that cannot fully be compensated or measured in

money.  Plaintiffs have no adequate remedy at law.  Pursuant to 17 U.S.C. § 502, Plaintiffs are entitled to a preliminary injunction and a permanent injunction prohibiting infringement of Plaintiffs' copyrights and exclusive rights under copyright.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

1. For a declaration that:

   a. Defendants' activities as alleged herein constitute counterfeiting and infringement of the Grooveshark Marks in violation of UMG's rights under Section 32 of the Lanham Act, 15 U.S.C. § 1114;

   b. Defendants' activities as alleged herein  violate Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), because Defendants' use of the Grooveshark Marks in connection with their Counterfeit Service in commerce constitutes a false designation of origin and unfair competition;

   c. Defendants' activities as alleged herein violate the federal Anticybersquatting Consumer Protection Act, 15 U.S.C. § l 125(d)(l); and

   d. Defendants, both directly and secondarily, willfully infringe Plaintiffs' copyrights;

2. For such equitable relief under Titles 15 and 28, and this Court's inherent equitable powers, as is necessary to prevent or restrain infringement of the Grooveshark Marks, including preliminary and permanent injunctions prohibiting Defendants and their officers, agents, servants, employees, attorneys, and others in active concert or participation with each or any of them:

a.  from using the Grooveshark Marks in any manner in connection with the advertising, offering for sale, or sale of any service or product, not provided by or authorized by Plaintiff UMG;

b.  from committing any acts calculated to cause purchasers to believe that Defendants' services are those offered under the control and supervision of UMG, or sponsored or approved by, or connected with, or guaranteed by, or produced under the control and supervision of UMG;

c.  from further infringing any of the Grooveshark Marks and damaging UMG's goodwill;

d.  from otherwise competing unfairly with UMG in any manner; and

e.  from using, linking to, transferring, selling, owning, or otherwise exercising control over the domain names grooveshark.io, grooveshark.pw or any other domain name that incorporates, in whole or in part, any of the Grooveshark Marks or through which Defendants infringe Plaintiffs' intellectual property rights (the "Infringing Domain Names"); and

requiring  Defendants and their officers, agents, servants, employees, attorneys, and others in active concert or participation with each or any of them to surrender the Infringing Domain Names.

3.  For entry of an Order requiring Defendants, within thirty (30) days after service of judgment with notice of entry thereof upon it, to file with the Court and serve upon UMG a written report under oath setting forth in detail the manner in which Defendants have complied with paragraph 2, a through e, *supra*.

4.  For entry of an Order requiring that either:  (a) Defendants account for and pay over to UMG all profits realized by Defendants by reason of Defendants' unlawful acts in

violation of the Lanham Act herein alleged, and that the amount of damages for infringement of the Grooveshark Marks be increased by a sum not exceeding three times the amount thereof as provided by law, or (b) UMG be awarded statutory damages of $2,000,000 for each and every one of the Grooveshark Marks willfully counterfeited by each Defendant and $250,000 per infringing domain name for Defendants' willful counterfeiting and cybersquatting of the Grooveshark Marks.

5.     For such equitable relief under Titles 17 and 28, and this Court's inherent equitable powers, as is necessary to prevent or restrain infringement of Plaintiffs' copyrights, including preliminary and permanent injunctions requiring Defendants and their officers, agents, servants, employees, attorneys, and others in active concert or participation with each or any of them to:

   a.   cease infringing, or causing, enabling, facilitating, encouraging, promoting and inducing or participating in the infringement of, any of Plaintiffs' copyrights, including but not limited to the copyrights in sound recordings listed in Exhibit E; and

   b.   surrender, and cease to use, the Infringing Domain Names.

6.     For entry of an Order, pursuant to Section 34 of the Lanham Act, Section 502 of the Copyright Act (17 U.S.C. § 502), The All Writs Act (28 U.S.C. § 1651(a)), and this Court's inherent equitable powers,

   a.   enjoining Defendants and all third parties with notice of the Order, including any Web hosts, content delivery networks, domain name registrars, domain name registries, or their administrators, from supporting or facilitating access to any or all domain names, URLs and websites (including, without

limitation, the Infringing Domain Names) through which Defendants infringe the Grooveshark Marks or Plaintiffs' copyrights;

b.   requiring domain name registries and/or registrars (including Namecheap, Inc.) holding or listing the Infringing Domain Names to: (a) disable grooveshark.io, grooveshark.pw and any substantially identical websites and/or domain names (including the Infringing Domain Names) through a registry hold, nameserver redirection or otherwise, and to make them inactive and non-transferable, and (b) transfer the Infringing Domain Names to a registrar to be appointed by Plaintiffs to re-register the domain names in Plaintiffs' names and under Plaintiffs' ownership; and

c.   enjoining all third parties with notice of the Order from maintaining, operating, or providing advertising, financial, technical or other support to Defendants and any other domain names, URLs or websites through which Defendants infringe the Grooveshark Marks or Plaintiffs' copyrights, including without limitation the Infringing Domain Names.

7.    For statutory damages pursuant to 17 U.S.C. § 504(c), in the amount of $150,000 per infringed work, arising from Defendants' willful violations of Plaintiffs' rights under the Copyright Act or, in the alternative, at Plaintiffs' election pursuant to 17 U.S.C. § 504(b), Plaintiffs' actual damages, including Defendants' profits from infringement, in amounts to be proven at trial.

8.    For an accounting, the imposition of a constructive trust, restitution of Defendants' unlawful proceeds from copyright infringement, and damages according to proof.

9.    For Plaintiffs' costs, including reasonable attorneys' fees, pursuant to 17 U.S.C. § 505, Sections 34-39 of the 1946 Trademark Act and otherwise.

10.    For prejudgment and post-judgment interest; and

11.    For such other relief as the Court may deem just and proper.

DATED:  New York, NY
        May 12, 2015

Respectfully submitted,

JENNER & BLOCK LLP


By: _____
    Andrew H. Bart (AB-6724)
    Gianni P. Servodidio (GS-0713)
    Lindsay W. Bowen (LB-8510)
    Alison I. Stein (AS-2884)
    Ava U. McAlpin (AM-4645)
    919 Third Avenue
    39th Floor
    New York, NY 10022
    Telephone:  (212) 891-1600
    Facsimile:  (212) 891-1699

    Kenneth L. Doroshow (KD-8374)
    1099 New York Ave., N.W.
    Suite 900
    Washington, DC 20001
    Telephone:  (202) 639-6027
    Facsimile:  (202) 639-6066

    *Attorneys for Plaintiffs*