**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ARISTA RECORDS LLC, ATLANTIC RECORDING CORPORATION, CAPITOL RECORDS, LLC, ELEKTRA ENTERTAINMENT GROUP INC., LAFACE RECORDS LLC, SONY MUSIC ENTERTAINMENT, UMG RECORDINGS, INC., WARNER BROS. RECORDS INC., WARNER MUSIC GROUP CORP., and ZOMBA RECORDING LLC, | CIVIL ACTION NO. _____ |

*Plaintiffs*,

v.

VITA TKACH, and DOES 1-10, D/B/A
GROOVESHARK.IO AND GROOVESHARK.PW

*Defendants*.

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF *EX PARTE*
APPLICATION FOR A TEMPORARY RESTRAINING ORDER, SEIZURE ORDER,
AND ORDER TO SHOW CAUSE FOR PRELIMINARY INJUNCTION**

**[FILED UNDER SEAL PURSUANT TO 15 U.S.C. § 1116]**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................. 1

BACKGROUND ..................................................................................................... 4

I.      PRIOR RELATED LITIGATION.................................................................... 4

II.     THE PARTIES ............................................................................................ 6

        A.      Plaintiffs.......................................................................................... 6

        B.      The Grooveshark Marks and Logo .................................................. 6

        C.      Plaintiffs' Copyrighted Sound Recordings ...................................... 7

        D.      Defendants ...................................................................................... 8

III.    THE COUNTERFEIT SERVICE.................................................................. 9

        A.      Launch of the Grooveshark.io Website ............................................ 9

        B.      Functionality of the Counterfeit Service......................................... 11

IV.     DEFENDANTS' EFFORTS TO EVADE DETECTION AND
        ENFORCEMENT IN THE UNITED STATES ......................................... 12

ARGUMENT ........................................................................................................ 14

I.      THIS COURT SHOULD ISSUE AN *EX PARTE* TEMPORARY
        RESTRAINING ORDER AND DOMAIN SEIZURE ORDER. ............... 14

        A.      This Court Has the Authority to Issue Temporary Injunctive
                Relief.............................................................................................. 14

        B.      This Court Has the Authority to Issue a Seizure Order and
                Injunctive Relief *Ex Parte*. ........................................................... 15

                1.      Rule 65 of the Federal Rules of Civil Procedure. ............... 15

                2.      15 U.S.C. § 1116................................................................. 16

                3.      Courts Often Issue *Ex Parte* Relief in Intellectual Property
                        Cases Under Fed. R. Civ. P. 65(b) and 15 U.S.C. §
                        1116(d)................................................................................ 17

        C.      *Ex Parte* Relief is Essential. ......................................................... 19

                1.      If Notice is Given, the Defendants Will Disappear and
                        Move All of Their Operations Outside the United States,

Rendering Plaintiffs' Enforcement Efforts Futile and
Disturbing the Status Quo......................................................19

2.  Plaintiffs Meets the Criteria for Issuance of a Seizure
Order *Ex Parte*...................................................................20

II.  PLAINTIFFS ARE HIGHLY LIKELY TO SUCCEED ON THE
MERITS OF THEIR CLAIMS....................................................................21

A.  Plaintiff UMG is Likely to Succeed on the Merits of its
Counterfeiting and Trademark Claims. ..........................................21

1.  Defendants Infringe Plaintiff UMG's Exclusive
Trademark Rights Under Sections 32 and 43(a) of the
Lanham Act..........................................................................21

a.  Plaintiff UMG Owns the Valid and Protectable
Grooveshark Marks....................................................22

b.  Consumers Are Likely to Be Confused as to the
Source of Defendants' Counterfeit Service. ..................22

2.  Defendants are Cybersquatting Under Section 43(d) of the
Lanham Act..........................................................................23

a.  UMG's Marks Are Distinctive. ...............................24

b.  The Infringing Domain Names are Identical to
UMG's Grooveshark Word Mark..............................24

c.  Defendants Have the Bad Faith Intent to Profit
from UMG's Grooveshark Mark. .............................24

B.  Plaintiffs are Likely to Succeed on the Merits of Their Copyright
Claims. ....................................................................................27

1.  Defendants Directly Infringe Plaintiffs' Copyrights. ...................27

2.  Defendants Secondarily Infringe Plaintiffs' Copyrights. ..............28

a.  Defendants are Vicariously Liable for Copyright
Infringement................................................................28

b.  Defendants are Liable for Inducement of
Copyright Infringement. ..............................................29

c.  Defendants Have Engaged in Contributory
Copyright Infringement. ..............................................29

III.    INJUNCTIVE RELIEF IS NECESSARY TO PREVENT
        IRREPARABLE HARM. ...................................................................................... 30

        A.    Defendants' Trademark Infringement Will Cause Irreparable
              Harm. ......................................................................................................... 30

        B.    Defendants' Copyright Infringement Will Cause Irreparable
              Harm. ......................................................................................................... 31

IV.     THE BALANCE OF THE HARDSHIPS STRONGLY FAVORS
        PLAINTIFFS. ................................................................................................. 33

V.      THE RELIEF REQUESTED WILL NOT HARM THE PUBLIC
        INTEREST ...................................................................................................... 33

VI.     DEFENDANTS ARE SUBJECT TO PERSONAL JURISDICTION. ..................... 34

        A.    Defendants' Conduct Renders Them Subject to This Court's
              Personal Jurisdiction Under New York's Long Arm Statute. ....................... 34

        B.    The Exercise of Jurisdiction Over Defendants Comports with the
              Requirements of Due Process. ..................................................................... 37

VII.    SERVICE OF PROCESS BY EMAIL IS WARRANTED IN THIS
        CASE. ............................................................................................................ 38

CONCLUSION ............................................................................................................ 40

# TABLE OF AUTHORITIES

CASES                                                                      PAGE(S)

*A&M Records, Inc. v. Napster, Inc.*,
    239 F.3d 1004 (9th Cir. 2001) ................................................................29, 30, 32

*Abercrombie & Fitch Co. v. Hunting World, Inc.*,
    537 F.2d 4 (2d Cir. 1976) ................................................................24

*Adidas AG v. Adidas2013online.com*,
    No. 13-24398-CIV, 2013 WL 6667043 (S.D. Fla. Dec. 17, 2013)............................16, 17, 20

*Advanced Access Content Sys. Licensing Admin., LLC v. Shen d/b/a DVDFab*,
    No. 14-cv-01112, slip op. (S.D.N.Y. Mar. 4, 2014) ................................................................14

*Am. Can Co. v. Manuskhani*,
    742 F.2d 314 (7th Cir. 1984) ................................................................16

*Arista Music, et al. v. Escape Media Grp., Inc.* ("*Arista Music*"),
    No. 11 Civ. 8407, 2014 WL 5089743 (S.D.N.Y. Sept. 29, 2014) ................................5, 27, 28

*Arista Records, LLC v. Doe 3*,
    604 F.3d 110 (2d Cir. 2010) ................................................................27, 29

*Arista Records LLC v. Lime Grp. LLC*
    ("*LimeWire*"), 784 F. Supp. 2d 398 (S.D.N.Y. 2011) ................................................................28, 29

*Arista Records LLC v. Usenet.com, Inc.*,
    633 F. Supp. 2d 124 (S.D.N.Y. 2009) ................................................................28

*Banff, Ltd. v. Federated Dep't Stores, Inc.*,
    841 F.2d 486 (2d Cir. 1988) ................................................................23

*Bank of Credit & Commerce Int'l (Overseas) Ltd. v. Tamraz*,
    No. 97 Civ. 4759 (SHS), 2006 WL 1643202 (S.D.N.Y. June 13, 2006) ................................39

*Briggs & Stratton Corp. v. Chonquing Rato Power Co., Ltd.*,
    No. 13-cv-316, 2013 WL 3972391 (N.D.N.Y. July 23, 2013) ................................15, 33, 34

*Burger King Corp. v. Rudzewicz*,
    471 U.S. 462 (1985) ................................................................37

*Capitol Records, LLC, d/b/a EMI Music North Am. v. Escape Media Grp., Inc.* ("*EMI*"),
    No. 12-CV-6646 (AJN), 2015 WL 1402049 (S.D.N.Y. Mar. 25, 2015) ........................ passim

*Capitol Records, LLC v. ReDigi Inc.*,
    934 F. Supp. 2d 640 (S.D.N.Y. 2013) ................................................................28

*Century Home Entm't, Inc. v. Laser Beat, Inc.*,
    859 F. Supp. 636 (E.D.N.Y. 1994) ......................................................................17

*Chanel, Inc. v. acheterchanel.com*,
    No. 12-cv-21854, 2012 WL 3544844 (S.D. Fla. Aug. 16, 2012) ...........................39

*Chloe v. Queen Bee of Beverly Hills, LLC*,
    616 F.3d 158 (2d Cir. 2010)...................................................................................34

*Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc.*,
    696 F.3d 206 (2d Cir. 2012)...................................................................................15

*Citigroup Inc. v. City Holding Co.*,
    97 F. Supp. 2d 549 (S.D.N.Y. 2000).....................................................................36

*CJ Prods. LLC v. Snuggly Plushez LLC*,
    809 F. Supp. 2d 127 (E.D.N.Y. 2011) ..................................................................33

*Columbia Pictures Indus., Inc. v. Fung*,
    710 F.3d 1020 (9th Cir. 2013) ...............................................................................28

*Columbia Pictures Television v. Krypton Broad. of Birmingham, Inc.*,
    106 F.3d 284 (9th Cir. 1997) .................................................................................37

*Complex Sys., Inc. v. ABN AMRO Bank N.V.*,
    No. 08-cv-7497, 2014 WL 1883474 (S.D.N.Y. May 9, 2014) ........................31, 32

*Corning Glass Works v. Jeanette Glass Co.*,
    308 F. Supp. 1321 (S.D.N.Y. 1970), *aff'd*, 432 F.2d 784 (2d Cir. 1970) ..............33

*Dallas Cowboys Cheerleaders v. Pussycat Cinema, Ltd.*,
    604 F.2d 200 (2d Cir. 1979)...................................................................................14

*Datatech Enters. v. FF Magnat Ltd*,
    No. 12-cv-4500, slip op. (N.D. Cal. Aug. 28, 2012)...............................................19

*Diarama Trading Co., Inc. v. J. Walter Thompson U.S.A., Inc.*,
    No. 01 Civ. 2950, 2005 WL 2148925 (S.D.N.Y. Sept. 6, 2005)............................24

*Ellison v. Robertson*,
    357 F.3d 1072 (9th Cir. 2004) ...............................................................................28

*Energy Brands Inc. v. Spiritual Brands, Inc.*,
    571 F. Supp. 2d 458 (S.D.N.Y. 2008)....................................................................36

*Golden Krust Patties, Inc. v. Bullock*,
    957 F. Supp. 2d 186 (E.D.N.Y. 2013) ..................................................................15

*Grand River Enters. Six Nations, Ltd. v. Pryor*,
    425 F.3d 158 (2d Cir. 2005)...................................................................................34

*Granny Goose Foods, Inc. v. Bhd. Of Teamsters & Auto Truck Drivers Local No. 70*,
 415 U.S. 423 (1974)................................................................................................16

*Gucci Am., Inc. v. Duty Free Apparel, Ltd.*,
 286 F. Supp. 2d 284 (S.D.N.Y. 2003)....................................................................23

*Home Box Office, Inc. v. Showtime/The Movie Channel, Inc.*,
 832 F.2d 1311 (2d Cir. 1987)..................................................................................30

*Ingraham v. Carroll*,
 90 N.Y.2d 592 (1997) .............................................................................................36

*Liberty Media Holdings, LLC v. FF Magnat Ltd.*,
 12-cv-1057, slip op. (D. Nev. June 21, 2012)............................................... 17, 18-19

*Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*,
 631 F. Supp. 735 (S.D.N.Y. 1985).........................................................................22

*Lorillard Tobacco Co. v. Jamelis Grocery, Inc.*,
 378 F. Supp. 2d 448 (S.D.N.Y. 2005).....................................................................23

*Louis Vuitton Malletier & Oakley, Inc. v. Veit*,
 211 F. Supp. 2d 567 (E.D. Pa. 2002) .....................................................................26

*Lucas Nursery & Landscaping, Inc. v. Grosse*,
 359 F.3d 806 (6th Cir. 2004) .............................................................................24, 25

*M. Shanken Commc'ns, Inc. v. Cigar500.com*,
 No. 07 Civ. 7371, 2008 WL 2696168 (S.D.N.Y. July 7, 2008) .............................37

*Marks Organization, Inc. v. Joles*,
 784 F.Supp.2d 322 (S.D.N.Y. 2011).................................................................14, 30

*Mason Tenders Dist. Council Pension Fund v. Messera*,
 No. 95 Civ. 9341, 1997 WL 223077 (S.D.N.Y. May 1, 1997).................................14

*Matter of Vuitton et Fils S.A.*,
 606 F.2d 1 (2d Cir. 1979) .............................................................................14, 16, 17

*McGraw-Hill Cos., Inc. v. Ingenium Techs. Corp.*,
 375 F. Supp. 2d 252 (S.D.N.Y. 2005).....................................................................36

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*,
 518 F. Supp. 2d 1197 (C.D. Cal. 2007) ..................................................................31

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*,
 545 U.S. 913 (2005).....................................................................................28, 31, 32

*Microsoft Corp. v. Does 1-8*,
 No. 13-CV-1014, slip op. (W.D. Tex. Nov. 25, 2013) ............................................20

*Minn. Mining & Mfg. Co. v. Taylor*,
  21 F. Supp. 2d 1003 (D. Minn. 1998) ................................................................34

*Mullane v. Central Hanover Bank & Trust Co.*,
  339 U.S. 306 (1950) .............................................................................................39

*N. Face Apparel Corp. v. Fujian Sharing Imp. & Exp. Ltd.*,
  No. 10-civ-1630, slip op. (S.D.N.Y. Mar. 2, 2010) ...................................... passim

*N.Y. City Triathlon, LLC v. NYC Triathlon Club, Inc.*,
  704 F. Supp. 2d 305 (S.D.N.Y. 2010) ..................................................................30

*Nat'l Football League v. Cheng d/b/a nfljerseydiscount.com*,
  No. 11-cv-344 (WHP), slip op. (S.D.N.Y. Jan. 19, 2011) .............................18, 39

*Nat'l Football League v. Primetime 24 Joint Venture*,
  131 F. Supp. 2d 458 (S.D.N.Y. 2001) .............................................................32, 33

*Nikon Inc. v. Ikon Corp.*,
  987 F.2d 91 (2d Cir. 1993) ....................................................................................22

*Paco Rabanne Parfums, S.A. v. Norco Enterps.*,
  680 F.2d 891 (2d Cir. 1982) ..................................................................................30

*PDK Labs, Inc. v. Proactive Labs, Inc.*,
  325 F. Supp. 2d 176 (E.D.N.Y. 2014) ..................................................................36

*Penguin Grp. (USA) Inc. v. Am. Buddha*,
  16 N.Y.3d 295 (2011) ...........................................................................................35

*Phillip Morris USA Inc. v. Veles Ltd.*,
  No. 06 CV 2988, 2007 WL 725412 (S.D.N.Y. Mar. 12, 2007) ...........................39

*Polaroid Corp. v. Polarad Elecs. Corp.*,
  287 F.2d 492 (2d Cir. 1961), *cert. denied,* 368 U.S. 820 (1961) ........................23

*Prediction Co. LLC v. Rajgarhia*,
  No. 09 Civ. 7459 (SAS), 2010 WL 1050307 (S.D.N.Y. Mar. 22, 2010) ..............39

*PRL USA Holdings, Inc. v. Kiat*,
  No. 10-cv-6456 (PGG), slip op. (S.D.N.Y. Sept. 1, 2010) ..................................18

*Register.com, Inc. v. Verio, Inc.*,
  356 F.3d 393 (2d Cir. 2004) ..................................................................................33

*Rio Properties, Inc. v. Rio Int'l Interlink*,
  284 F.3d 1007 (9th Cir. 2002) ..........................................................................38, 39

*Rogers v. Koons*,
  960 F.2d 301 (2d Cir. 1992) ..................................................................................27

*Salinger v. Colting*,
    607 F.3d 68 (2d Cir. 2010).................................................................................15, 33

*Savage Universal Corp. v. Grazier Constr., Inc.*,
    No. 04 Civ. 1089, 2004 WL 1824102 (S.D.N.Y. 2004) ............................................35

*Scarves by Vera, Inc. v. Todo Imports Ltd.*,
    544 F.2d 1167 (2d Cir. 1976)......................................................................................34

*SEC v. Citigroup Global Mkts. Inc.*,
    673 F.3d 158 (2d Cir. 2012)....................................................................................15, 4

*Station Casinos, Inc. v. Domain Magic, LLC*,
    No. 06-CV-01610-RCJ-RJJ, 2006 WL 3838221 (D. Nev. Dec. 20, 2006) ..............17

*TCPIP Holding Co., Inc. v. Haar Commc'ns, Inc.*,
    244 F.3d 88 (2d Cir. 2001)..........................................................................................24

*Ticor Title v. Cohen*,
    173 F.3d 63 (2d Cir. 1999)..........................................................................................32

*Tiffany (NJ) LLC v. Dong*,
    No. 11 Civ. 2183(GBD)(FM), 2013 WL 4046380 (S.D.N.Y. Aug. 9, 2013)...........26

*Time, Inc. v. Petersen Publ'g Co.*,
    173 F.3d 113 (2d Cir. 1999)........................................................................................22

*Tishman v. The Associated Press*,
    No. 05 Civ. 4278, 2006 WL 288369 (S.D.N.Y. Feb. 6, 2006) ..................................39

*True Religion Apparel, Inc. v. Xiaokang Lei*,
    No. 11-cv-8242(HB), slip op. (S.D.N.Y. Nov. 17, 2011)............................... passim

*U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc.*,
    800 F. Supp. 2d 515 (S.D.N.Y. 2011)....................................................................14, 30

*UMG Recordings, Inc. v. Escape Media Grp., Inc.*,
    No. 100152/10 (N.Y. Sup. Ct. Jan. 6, 2010) ...............................................................5

*UMG v. Escape*,
    No. 100152/10 (May 4, 2015), Dkt. No. 269................................................................5

*Vuitton v. White*,
    946 F.2d 569 (3d Cir. 1991).........................................................................................17

*Warner Bros., Inc. v. Gay Toys, Inc.*,
    658 F.2d 76 (2d Cir. 1981)...........................................................................................14

*WPIX, Inc. v. ivi, Inc.*,
    691 F.3d 275 (2d Cir. 2012), *cert. denied*, 133 S. Ct. 1585 (2013) ....................33, 34

**STATUTES**

15 U.S.C. § 1057(b) ............................................................................................................22

15 U.S.C. § 1114 ..................................................................................................17, 21, 22

15 U.S.C. § 1115(a) ............................................................................................................24

15 U.S.C. § 1116 ..............................................................................................................1, 16

15 U.S.C. § 1116(a) ............................................................................................................14

15 U.S.C. § 1116(d) ..................................................................................................16, 17, 23

15 U.S.C. § 1116(d)(4) ....................................................................................................17, 20

15 U.S.C. § 1125(a) ............................................................................................................22

15 U.S.C. § 1125(d) ........................................................................................................23, 24

15 U.S.C. § 1125(d)(1)(B)(i) ............................................................................................25, 26

15 U.S.C. § 1125(d)(1)(C) ................................................................................................17

15 U.S.C. § 1127 ................................................................................................................23

17 U.S.C. § 502 ....................................................................................................................1

17 U.S.C. § 502(a) ............................................................................................................14

28 U.S.C. § 1651(a) ........................................................................................................1, 14

Anticybersquatting Consumer Protection Act of 1996 ("ACPA") ................................23

N.Y. C.P.L.R. § 302(a)(3)(ii) ............................................................................................35

**OTHER AUTHORITIES**

Senate-House Joint Explanatory Statement on Trademark Counterfeiting Legislation,
    130 Cong. Rec. H12076 (Oct. 10, 1984) ................................................................16

Fed. R. Civ. P. 4 ................................................................................................................38

Fed. R. Civ. P. 4(f)(2) ........................................................................................................38

Fed. R. Civ. P. 4(f)(3) ........................................................................................................38

Fed. R. Civ. P. 65 ..........................................................................................................14, 15

Fed. R. Civ. P. 65(b) ......................................................................................................16, 17

Fed. R. Civ. P. 65(b)(1)......................................................................................................6

Fed. R. Civ. P. 65(d)(2)....................................................................................................14

Local Rule 6.1(d) ............................................................................................................. 16

x

Pursuant to Federal Rule of Civil Procedure 65, 15 U.S.C. § 1116, 17 U.S.C. § 502, and the All Writs Act, 28 U.S.C. § 1651(a), Plaintiffs Arista Records LLC, Atlantic Recording Corp., Capitol Records, LLC, Elektra Entertainment Group Inc., LaFace Records, LLC, Sony Music Entertainment, UMG Recordings, Inc., Warner Bros. Records Inc., Warner Music Group Corp., and Zomba Recording LLC (collectively "Plaintiffs") hereby apply, on an *ex parte* basis, for entry of a temporary restraining order ("TRO") requiring Defendants Vita Tkach and Does 1-10, d/b/a Grooveshark.io and Grooveshark.pw (collectively "Defendants") to immediately cease and desist all use of Plaintiffs' trademarks and copyrighted sound recordings, and requiring the domain name registrar of the Grooveshark.io and Grooveshark.pw domain names and any other domain names with substantially identical variations thereof (the "Infringing Domain Names") to change the authoritative name-servers for the Infringing Domain Names to servers controlled by Plaintiffs pending further direction from the Court, and, upon expiration of the TRO, for a preliminary injunction against Defendants.  In support thereof, Plaintiffs submit the following memorandum of law.

## PRELIMINARY STATEMENT

This case arises out of an egregious, bad faith campaign of counterfeiting, cybersquatting, and copyright infringement.  Defendants are anonymous, scofflaw Internet website operators who have launched a "copycat" version of a well-known music streaming service known as "Grooveshark" and have made their version available to the world at a newly-created website accessible at grooveshark.io (the "Counterfeit Service").  Defendants admittedly launched their Counterfeit Service to frustrate Plaintiffs' multi-year enforcement efforts against the former operators of Grooveshark, which culminated in the entry of *three* consent judgments and permanent injunctions within the past eleven days—including by two Courts within this District —requiring the former operators of Grooveshark to terminate their operation of the service.

1

Within days after the former Grooveshark operators announced their termination of the former service and assignment of the goodwill related thereto to Plaintiff UMG Recordings, Inc. ("UMG"), Defendants launched their Counterfeit Service, allowing users to download and stream infringing copies of Plaintiffs' sound recordings on a massive scale, in flagrant violation of Plaintiffs' copyrights.  Defendants branded their Counterfeit Service by stealing trademarks used to identify the Grooveshark service (the "Grooveshark Marks") that UMG had just obtained through a settlement agreement between Plaintiffs and the former operators of the Grooveshark service.  In so doing, Defendants openly sought to sow confusion in the marketplace and have caused consumers to believe that the original Grooveshark service was resurrected, notwithstanding Plaintiffs' collective enforcement efforts.

Not only does the domain name for the Counterfeit Service contain the word mark "Grooveshark" (the "Grooveshark Word Mark"), but, as shown below, the Counterfeit Service prominently features counterfeit replicas of UMG's trademarked Grooveshark shark fin logo, as well as identical graphical elements taken from the original Grooveshark website near the height of its popularity:

*Figure A. The Counterfeit Service:*



2

*Figure B. The original Grooveshark music service:*



*See* Declaration of Gianni P. Servodidio ("Servodidio Decl.," submitted herewith) ¶¶ 3, 4, 18 &

Exs. A, F (website screenshots).

Defendants' brazen trademark and copyright infringement have caused and will continue

to cause irreparable injury to Plaintiffs.  As expected and intended by Defendants, the

Counterfeit Service already has confused the target consumers as to whether the original

Grooveshark music service has been restored.  The harm to relationships, diminished goodwill,

loss of control over reputation, loss of quality control, and massive viral copyright infringement

that Plaintiffs face as a result of the Counterfeit Service is quintessentially irreparable.

The open nature of the Internet has made it easy for counterfeiters and cybersquatters

such as Defendants to hide their true identities and operate from physical locations outside of the

United States with impunity.  *Ex parte* relief is therefore necessary here, as advanced notice

would allow Defendants, who operate at the shadowy margins of the Internet, easily to disappear

or move their operations beyond this Court's jurisdiction, thereby rendering Plaintiffs'

enforcement efforts futile.  Indeed, as described herein, Defendants have already moved part of

critical components of their Counterfeit Service outside of the United States in response to a copyright infringement notification forwarded on behalf of Plaintiffs to one of Defendants' Internet service providers.

To halt Defendants' unlawful activities, Plaintiffs respectfully request that this Court issue *ex parte*:  (i) a Temporary Restraining Order and Preliminary Injunction against Defendants, enjoining Defendants from directly or indirectly infringing in any manner any of Plaintiffs' sound recordings and the Grooveshark Marks; (ii) an Order requiring domain name registrars to change the authoritative name-servers for the Infringing Domain Names to servers controlled by Plaintiffs pending further order of this Court, the effect of which would be to disable access to the Infringing Domain Names during the pendency of this case; and (iii) an Order allowing service by electronic mail.

## BACKGROUND

### I.      Prior Related Litigation

Escape Media Group, Inc. ("Escape") is the former owner and operator of the well-known music streaming service known as "Grooveshark," previously accessible at the website grooveshark.com.  From at least as early as 2007 until April 30, 2015, Escape's Grooveshark service offered users the ability to stream music directly from the Grooveshark website to their personal computers or other compatible devices.  The Grooveshark music service was extremely popular, boasting as many as 35 million monthly users at its peak.  Declaration of Mark McDevitt ("McDevitt Decl.," submitted herewith) ¶ 3.  For the vast majority of music that it provided through the Grooveshark service, however, Escape did not have licenses from Plaintiffs and other copyright owners.  *See id.*

Plaintiffs filed and prosecuted a series of high-profile copyright infringement and unfair competition actions in New York federal and state courts against Escape based on various

aspects of its operation of the Grooveshark service.  Compl., *Capitol Records, LLC, d/b/a EMI Music North Am. v. Escape Media Grp., Inc.* ("*EMI*"), No. 12-CV-6646 (AJN), Dkt. No. 1 (S.D.N.Y. Aug. 30, 2012); Compl.,  *Arista Music, et al. v. Escape Media Grp., Inc*. ("*Arista Music*"), No. 11 Civ. 8407, Dkt. No. 3 (S.D.N.Y. Dec. 18, 2011); Compl., *UMG Recordings, Inc*. *v. Escape Media Grp., Inc.*, No. 100152/10 (N.Y. Sup. Ct. Jan. 6, 2010).  Within the past nine months, the courts in *Arista Music* and *EMI* (both in this District) granted summary judgment against Escape based on its infringement of Plaintiffs' copyrighted works.  *See Arista Music*, No. 11 Civ. 8407 (TPG), 2014 WL 5089743 (S.D.N.Y. Sept. 29, 2014); *EMI*, No. 12-CV-6646 (AJN), 2015 WL 1402049 (S.D.N.Y. Mar. 25, 2015) (adopting Report and Recommendation).

On April 30, 2015, on the eve of a damages trial in the *Arista Music* action, Escape ceased to operate the Grooveshark music service and assigned its intellectual property, including, but not limited to, the Grooveshark Marks to UMG under a settlement agreement between Plaintiffs and Escape.  Servodidio Decl. ¶ 6 & Ex. C (May 8, 2015 Intellectual Property Assignment).  On that same date, Escape and Plaintiffs submitted consent judgments in all three cases providing for permanent injunctive relief against Escape and, in two of the cases, awarding Plaintiffs monetary damages of $50 million dollars (in the *Arista Music* case) and $25 million dollars (in the *EMI* case).  *Id.* ¶ 7.  The courts entered all three judgments shortly thereafter. *EMI*, No. 12-CV-6646 (AJN) (May 5, 2015), Dkt. No. 108; *Arista Music*, No. 11 Civ. 8407 (TPG) (May 1, 2015), Dkt. No. 175; *UMG v. Escape*, No. 100152/10 (May 4, 2015), Dkt. No. 269.

Plaintiffs' actions against Escape in connection with the Grooveshark music service and its cessation of the Grooveshark music service (and assignment of goodwill relating thereto to UMG) have received widespread media coverage in various national news outlets, including *The New York Times*, *The Washington Post*, and *The Los Angeles Times*.  *See* McDevitt Decl., Ex. A.

## II.     The Parties

### A.     Plaintiffs

Plaintiffs are in the business of producing, manufacturing, distributing, selling, licensing, and facilitating the distribution, sale, public performance, and other authorized uses of sound recordings (*i.e.*, recorded music).  Leak Decl. ¶ 3; Hochberg Decl. ¶ 3; Schmidt Decl. ¶ 3.  The considerable artistic and technical quality of Plaintiffs' sound recordings is well-known in New York, and throughout the United States and the world.[1]

### B.     The Grooveshark Marks and Logo

In accordance with a settlement agreement between Escape and Plaintiffs, UMG is the owner by assignment from Escape of the entire right, title, and interest in and to, *inter alia*, the Grooveshark Marks, which are federally-registered trademarks, and all of the goodwill of the business associated with the Grooveshark Marks.  Information from those registrations is summarized below:

| Registration No. | Trademark | Good and Services |
|---|---|---|
| 4114779 | GROOVESHARK | Entertainment marketing services, namely, marketing, promotion and advertising for recording and performing artists.  Audio broadcasting; Internet radio broadcasting services; broadcasting of audio programming over the Internet.  Entertainment services via the Internet, namely, providing nondownloadable prerecorded music, providing nondownloadable prerecorded music according to consumer preferences, and providing information in the field of music. |
| 4114780 |  | Same as above. |

---

[1] Plaintiffs each have a principal place of business or maintain an office in New York, New York. Declaration of Darren J. Schmidt ("Schmidt Decl.," submitted herewith) ¶ 3; Declaration of Wade Leak ("Leak Decl.," submitted herewith) ¶ 3; Declaration of Ellen Hochberg ("Hochberg Decl," submitted herewith) ¶ 3.

*See* Schmidt Decl.¶¶ 6-7, Exs. B & C.  The registrations listed above are valid, subsisting, unrevoked, and uncancelled.  *See id.*

The Grooveshark Marks are well known and have been widely and extensively used and promoted in interstate commerce on or in connection with the music streaming services offered by Escape.  As such, the public and relevant consumers have come to recognize the Grooveshark Marks as identifying a single source of services (*i.e.*, the Grooveshark music service).  *See* McDevitt Decl. ¶ 3.

### C. Plaintiffs' Copyrighted Sound Recordings

Plaintiffs are the copyright owners or owners of exclusive rights with respect to the majority of copyrighted sound recordings sold in the United States, including by some of the most popular and successful recording artists of all time, such as Beyoncé, Bob Marley, Green Day, Justin Timberlake, Kanye West, Lady Gaga, Michael Jackson, the Red Hot Chili Peppers, Santana, and many more.  *See* Servodidio Decl. ¶ 10.  Plaintiffs have invested and continue to invest significant money, time, effort, and creative talent to create, promote, sell, and license their sound recordings.  *Id.*  Plaintiffs distribute, sell, and/or license their sound recordings in the form of CDs and other tangible media throughout the United States, including in New York. Plaintiffs also sell, distribute, publicly perform, and/or license their sound recordings in the form of digital audio files through legitimate and authorized internet services, such as iTunes, Amazon, Beats Music, Rhapsody and Spotify, which are available throughout the United States, including in New York.  *Id.*

A non-exhaustive, illustrative list of Plaintiffs' federally copyrighted sound recordings that Defendants have illegally reproduced, distributed, and/or performed to their users is attached as Exhibit E to the Complaint filed herewith.  Compl., Ex. H.  Each Plaintiff has received Certificates of Copyright Registration from the Register of Copyrights for these copyrighted

sound recordings.  Schmidt Decl., Ex. A; Leak Decl., Ex. A; Hochberg Decl., Ex. A.

### D.    Defendants

As far as Plaintiffs have been able to determine, Defendants reside and operate the
Counterfeit Service from unknown locations outside the United States.  Servodidio Decl. ¶ 11.
On or about May 2, 2015, Defendants obtained registrations for the Infringing Domain Names
"grooveshark.io" and "grooveshark.pw."  McDevitt Decl. ¶ 9.  The relevant registration records
indicate that Defendants registered "grooveshark.io" and "grooveshark.pw" through the services
of Namecheap, Inc., a domain name registrar based in Los Angeles, California.  *See id.* ¶ 10 &
Ex. B (registration records for grooveshark.io and grooveshark.pw).  The .io domain is
administered by NIC.io, which is operated by Internet Computer Bureau, a provider of domain
name services based in the United Kingdom.  *Id.* ¶ 9 & n.1; Servodidio Decl. ¶ 11 n.1.  The .pw
domain name is administered by the .PW Registry, which is controlled by the Directi Group, a
business organization with offices in India, China, and the United Arab Emirates.  Internet traffic
to the web address grooveshark.pw is automatically redirected to the Grooveshark.io website.
Servodidio Decl. ¶ 12 n. 2.

The registration record for Grooveshark.io lists Defendant "Vita Tkach" as the Domain
Owner, Admin Contact, Technical Contact, and Billing Contact with an address in the city of
Vinnytsia in the Ukraine.  *See* McDevitt Decl. ¶ 10 & Ex. B (registration record).[2]  Plaintiffs
have been unable to locate any publicly available information beyond the domain registration
record identifying any person named "Vita Tkach" as involved in any manner with the
Grooveshark.io domain.  Servodidio Decl. ¶ 14.  It is common for pirate website operators to
supply false information to the domain name registrar when securing a domain name in order to

---

[2] Registration of the grooveshark.pw domain is in the name of "WhoisGuard, Inc.," an identity protection
service based in Panama.  McDevitt Decl. ¶ 10.

conceal their true identities.  *See* McDevitt Decl. ¶ 11.  In this case, it is almost certain that Vita

Tkach is an alias.  *Id.*

Does 1-10 are individuals who, along with Vita Tkach, own and/or operate the

Counterfeit Service, but whose identities and addresses are currently unknown to Plaintiffs.

Servodidio Decl. ¶ 15.

## III.    The Counterfeit Service

### A.    Launch of the Grooveshark.io Website

On May 5, 2015—within days of the press coverage announcing the cessation of

Escape's operation of the Grooveshark music service and the assignment of the marks associated

with that service to Plaintiff UMG, pursuant to a settlement agreement with Escape and

Plaintiffs—Defendants launched their Counterfeit Service at the web address "grooveshark.io,"

which allows users to download and stream infringing copies of Plaintiffs' sound recordings

directly from servers operated or controlled by Defendants, in flagrant violation of Plaintiffs'

copyrights.

Defendants' Counterfeit Service is a blatant "clone" of the original Grooveshark website

and service, and it is intended to mislead and confuse consumers regarding the source,

sponsorship, and affiliation of the service.  As depicted above, the Grooveshark.io website

prominently features counterfeit replicas of the Grooveshark Marks as well as identical graphical

elements taken from the original Grooveshark website.  *See supra*, at 2-3; Servodidio Decl. ¶¶ 3,

18 & Exs. A, F (website screenshots).

In furtherance of their unlawful scheme, Defendants have contacted various U.S.-based

media outlets using the aliases "New Grooveshark" and "Shark" to boast of their efforts to copy

and resurrect the original Grooveshark service.  In emails to reporters, the operators of the

Counterfeit Service admitted their bad faith, stating, for example, that they copied the original

Grooveshark website "[b]ecause YES, we can. And we want to. Simple as that." McDevitt Decl. ¶ 14 & Ex. D. Acknowledging the illegality of their conduct and the likelihood of copyright enforcement efforts against them, Defendants asserted that "[i]t's going to be a roller coaster, and we're ready for it." *Id*. ¶ 14 & Ex. E.

Adding to their attempts to mislead the public, Defendants have described the Counterfeit Service on popular search engines with the patently false and misleading claim that the Counterfeit Service is the "New Grooveshark.com." *See* Servodidio Decl., Ex. D (Google and Bing search results for the terms "Grooveshark" and "Grooveshark.io," respectively). As part of this campaign of deception, "Shark" claimed an affiliation with Escape, telling the media that he or she "was connected to Grooveshark a few years back." *Id.*, Ex F.

Defendants also claim to have the technical capability to restore the Grooveshark Music Service as it existed before Escape ceased its operations. "Shark" has told the press that "I have, together with the team I've gathered, the knowledge and the technological abilities to bring it back to life." *Id.* Defendants claim to have copied "90%" of the contents of the Grooveshark music service in anticipation of the shutdown of the service following the courts' entry of consent judgments against Escape in the actions noted above. *See id.*[3] In short, Defendants have registered and are using the Infringing Domain Names with a bad-faith intent to profit from the Grooveshark Marks by tricking consumers into believing that Defendants' Counterfeit Service is the same service as Grooveshark.com.

These efforts have succeeded in causing actual confusion among Internet users. A

---

[3] Despite Defendants' claim to have resurrected the old Grooveshark Music Service, the Counterfeit Service is apparently a mere rebranding of an already-existing pirate music site, which Defendants are seeking to promote through the unauthorized use of the Grooveshark Marks. As one media outlet observed, "[t]he [Grooveshark.io] site appears to be a rebranding of mp3juices.se, another music piracy site. . . suggesting that Shark may instead be using the Grooveshark name to bring attention to mp3juices." *See id*.

selection of recent posts from Twitter.com shows that users were misled into believing, *inter alia*, that "Grooveshark is back, and how!" "Grooveshark is back from the dead," "someone revived the recently defunct Grooveshark," "Grooveshark is back up through Grooveshark_io," and "someone resurrected Grooveshark." *See, e.g.*, Servodidio Decl., Ex. E.

>        **B.**        **Functionality of the Counterfeit Service**

The Counterfeit Service hosts a vast number of MP3 music files (a popular format for digital music files). Defendants announce to search engines that "GrooveShark.io is a web-based music application built for anyone on the internet to listen to music on-demand at no charge, New Grooveshark.com." *See id.*, Ex. D.

Users who visit the Grooveshark.io website can locate these MP3 files with a search box, copied from the original Grooveshark website, which is prominently displayed to the user. After a user enters a search query, the Counterfeit Service directs users to search result pages, which contain links to MP3 files located on Defendants' servers. This process enables users to reproduce or perform the song embodied in each MP3 file. Each result on a search result page contains two types of icons: (a) a "download" icon, which enables users to download a new copy of the MP3 file, and (b) a "play" icon, which opens a small in-page player and begins playing the song. *Id.* ¶ 18.

The Counterfeit Service's collection of MP3 files is vast and contains an enormous number of Plaintiffs' copyrighted works. With only a few keystrokes, users can quickly and easily find, and then reproduce or perform, full-length infringing copies of legendary sound recordings like Michael Jackson's "Billie Jean," Green Day's "American Idiot," and Lady Gaga's "Born This Way," to name just a few. *Id.* ¶ 19.

As a direct result of Defendants' widespread and brazen infringement of the Grooveshark Marks and Plaintiffs' copyrighted works, the Counterfeit Service threatens to pick up where

Escape's Grooveshark music service left off.  Escape's service was one of the most popular music streaming sites on the Internet, attracting up to 35 million monthly users during its nine years of operation and generating significant revenue.  McDevitt Decl. ¶ 3.

As an indicator of the growing popularity of the Counterfeit Service, Grooveshark.io is already the top search return on Google in response to a query for "Grooveshark," even though the Counterfeit Service has existed for *less than a week*.  Servodidio Decl., Ex. D (Google results at 1).  This growing popularity of the Counterfeit Service will enable Defendants to enrich themselves at the expense of copyright owners, like Plaintiffs, whose sound recordings are pirated on an immense scale through the Counterfeit Service on a daily basis.

## IV.   Defendants' Efforts to Evade Detection and Enforcement in the United States

Defendants have already taken actions to hide their identities and location.  They employ the services of an Internet service provider called "CloudFlare" in connection with certain aspects of the Grooveshark.io website.  McDevitt Decl. ¶ 16.  CloudFlare provides a so-called "pass-through security service" that acts, in effect, as a "middleman" that sits between a website and the users who interact with it.  *Id.*  Rather than allow users to contact the server on which the website is hosted directly, CloudFlare receives certain user interactions with the Grooveshark.io website and relays them through CloudFlare servers to the hosting provider.  *Id.*  Because of the presence of CloudFlare's servers, it is impossible to identify the location of the actual server supporting those aspects of the website absent the disclosure of this information by CloudFlare (or by Defendants themselves).  *Id.*

Defendants employ CloudFlare for all aspects of the Counterfeit Service except for the distribution of digital music files, which Defendants host on a server with the domain name "dl.grooveshark.io." (the "Download Server").  *Id.* ¶ 17.  When Defendants launched the Counterfeit Service on May 5, 2015, the Download Server was hosted by Nodisto IT, LLC, a

website hosting service provider with addresses in Las Vegas, Nevada and Dallas, Texas.  *Id.*

On or about May 5, 2015, the Recording Industry Association of America ("RIAA") submitted a copyright complaint notice to CloudFlare regarding its role in the operation of the Counterfeit Service.  In response to this notice, CloudFlare informed the RIAA that it had notified the operator of the Grooveshark.io website of the RIAA's complaint, but did not discontinue providing its services to the website.  *Id.* ¶ 18.  In addition, CloudFlare confirmed that the hosting provider for the Grooveshark.io website was Nodisto IT, LLC, and stated that it had also notified Nodisto of the RIAA's complaint.  *See id.*, Ex. H.

Immediately following CloudFlare's notifying Defendants of the RIAA's complaint, Defendants moved the Grooveshark.io website to a new hosting provider that was located outside the United States.  *Id.* ¶ 18.  As of May 6, 2015, Defendants had secured a new IP address for the Download Server (37.48.71.20), which belongs to a block of IP addresses assigned to an Internet hosting provider called "LeaseWeb"[4] with a business address in Amsterdam, The Netherlands.  *See id.* ¶ 19.  It appears the Download Server is physically situated in The Netherlands.  *Id.*[5]

---

[4] LeaseWeb has a long history of hosting major pirate sites.  McDevitt Decl. ¶ 20.  For example, LeaseWeb once hosted the notorious (and now shuttered) pirate website "MegaUpload," which was the subject of the largest criminal copyright law enforcement action ever undertaken.  *Id.*  Similarly, LeaseWeb has been a defendant in litigation in The Netherlands brought by BREIN, the leading Dutch antipiracy agency, in order to obtain disclosure of the identities of its customers that operated pirate sites. *Id.*  In a case that is well known in the antipiracy community regarding the prominent pirate site "Everlasting.nu," LeaseWeb refused to terminate hosting for the site or to disclose contact information regarding the website operator.  *Id.*  Other examples of LeaseWeb's involvement with pirate sites are also well known in the antipiracy community.  *Id.*

[5] Although the Counterfeit Service has been in existence for only a matter of days, the Grooveshark.io operator known only as "Shark" has reportedly informed media outlets that Defendants already "had to move hosting companies four times."  *See* McDevitt Decl., ¶ 19 n.4 & Ex. G.

<u>**ARGUMENT**</u>

I.     **This Court Should Issue an *Ex Parte* Temporary Restraining Order and Domain
       Seizure Order.**

       A.     **This Court Has the Authority to Issue Temporary Injunctive Relief.**

       This Court's "'inherent equitable power to issue provisional remedies ancillary to its

authority to provide final equitable relief'" encompasses temporary injunctions.  *Mason Tenders*

*Dist. Council Pension Fund v. Messera*, No. 95 Civ. 9341, 1997 WL 223077, at *7 n. 19

(S.D.N.Y. May 1, 1997) (quoting *Reebok Int'l, Ltd. v. Marnatch Enters., Inc.*, 970 F.2d 552, 559

(9th Cir. 1992)).  Rule 65 of the Federal Rules of Civil Procedure authorizes the Court to issue

injunctions binding parties, parties' officers, agents, servants, employees, and attorneys and any

"other persons who are in active concert or participation with" those previously listed.  Fed. R.

Civ. P. 65(d)(2).  Further, this Court "may issue all writs necessary or appropriate in aid of [its] .

. . jurisdiction[ ] and agreeable to the usages and principles of law."  28 U.S.C. § 1651(a); *see*

*also Matter of Vuitton et Fils S.A.*, 606 F.2d 1, 3 n.5 (2d Cir. 1979).

       Courts regularly issue injunctive relief on the basis of Lanham Act or Copyright Act

violations.  15 U.S.C. § 1116(a); 17 U.S.C. § 502(a); *see, e.g.*, Prelim. Inj. Order, *Advanced*

*Access Content Sys. Licensing Admin., LLC v. Shen d/b/a DVDFab*, No. 14-cv-01112, slip op.

(S.D.N.Y. Mar. 4, 2014) (Dkt. No. 21) (Copyright Act); *Marks Organization, Inc. v. Joles*, 784

F.Supp.2d 322, 335 (S.D.N.Y. 2011) (Lanham Act); *U.S. Polo Ass'n, Inc. v. PRL USA Holdings,*

*Inc.*, 800 F. Supp. 2d 515, 542 (S.D.N.Y. 2011) (Lanham Act); TRO, *True Religion Apparel, Inc.*

*v. Xiaokang Lei*, No. 11-cv-8242(HB), slip op. at 6-7, 9 (S.D.N.Y. Nov. 17, 2011) (Dkt. No. 7)

(hereinafter "*True Religion* TRO") (Copyright Act and Lanham Act); *see also Warner Bros., Inc.*

*v. Gay Toys, Inc.*, 658 F.2d 76, 80 (2d Cir. 1981) (Lanham Act); *Dallas Cowboys Cheerleaders*

*v. Pussycat Cinema, Ltd.*, 604 F.2d 200, 205 (2d Cir. 1979) (Lanham Act).

       The applicable standards for a TRO and preliminary injunction are the same.  Either form

of interim relief is appropriate upon a showing that (1) the movant will suffer irreparable harm in the absence of such relief and (2) *either* a likelihood of success on the merits *or* "sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc.*, 696 F.3d 206, 215 (2d Cir. 2012) (citation and quotation marks omitted).  In addition, (3) the "court must consider the balance of hardships between the plaintiff and defendant," *Salinger v. Colting*, 607 F.3d 68, 80 (2d Cir. 2010), and (4) "ensure that the injunctive provisions of the order do not harm the public interest," *Briggs & Stratton Corp. v. Chonquing Rato Power Co., Ltd.*, No. 13-cv-316, 2013 WL 3972391, *1 n.4 (N.D.N.Y. July 23, 2013).  *See SEC v. Citigroup Global Mkts. Inc.*, 673 F.3d 158, 163 n.1 (2d Cir. 2012); *Golden Krust Patties, Inc. v. Bullock*, 957 F. Supp. 2d 186, 194 (E.D.N.Y. 2013).

As demonstrated *infra* in Sections II-V, Plaintiffs readily meet this standard.  Defendants' actions—the unauthorized use of UMG's marks and the unauthorized copying, distribution, and public performance of Plaintiffs' protected sound recordings—plainly constitute trademark and copyright infringement.  With each day of its continued use, the Counterfeit Service poses a significant and immediate threat to the economic viability of Plaintiffs' businesses, their musicians and artists, and, indeed, the entire music industry.  The balance of hardships thus falls decisively in favor of the issuance of interim relief, and such relief would fully serve the public interest.  *See infra*, Sections III-V.

## B.    This Court Has the Authority to Issue a Seizure Order and Injunctive Relief *Ex Parte*.

### 1.    Rule 65 of the Federal Rules of Civil Procedure.

This Court has the authority to grant an *ex parte* TRO where the moving party sets forth facts that demonstrate an immediate and irreparable injury and show good cause why notice should not be required.  Fed. R. Civ. P. 65(b)(1); *see Granny Goose Foods, Inc. v. Bhd. Of*

15

*Teamsters & Auto Truck Drivers Local No. 70*, 415 U.S. 423, 439 (1974) ("Ex parte temporary restraining orders are no doubt necessary in certain circumstances"). This Court's Local Rule 6.1(d) requires "a clear and specific showing by affidavit of good and sufficient reasons why a procedure other than by notice of motion is necessary, and stating whether a previous application for similar relief has been made." L.R. 6.1(d). Courts will grant Rule 65(b) *ex parte* injunctive relief in two situations: (1) when notice is impossible because plaintiff cannot identify defendants or their locations; or (2) a showing that proceeding *ex parte* is the only method that will provide plaintiff with effective relief. *See Matter of Vuitton*, 606 F.2d at 5; *Am. Can Co. v. Manuskhani*, 742 F.2d 314, 322 (7th Cir. 1984); TRO, *N. Face Apparel Corp. v. Fujian Sharing Imp. & Exp. Ltd.*, No. 10-civ-1630, slip op. at 1-4 (S.D.N.Y. Mar. 2, 2010) (Dkt. No.15) (hereinafter "*Fujian* TRO").

### 2. 15 U.S.C. § 1116.

This Court has the additional authority to issue an *ex parte* seizure order under Section 34(d) of the Lanham Act (15 U.S.C. § 1116(d)). In providing for *ex parte* remedies for counterfeiting, Congress aimed to provide courts with the ability to prevent counterfeiters served with a civil summons from disappearing or quickly disposing of evidence, thus evading the courts' ability to exercise jurisdiction effectively. Senate-House Joint Explanatory Statement on Trademark Counterfeiting Legislation, 130 Cong. Rec. H12076, at 12080 (Oct. 10, 1984).

Under this same authority, courts may order that an infringing domain name be seized and transferred by the registrar of the domain name to a registrar of plaintiff's selection to hold and disable the domain name until further order from the court, so that defendants are impeded from transferring the infringing domain to another registrant or registrar, in an effort to elude the court's jurisdiction. *See, e.g.*, *Adidas AG v. Adidas2013online.com*, No. 13-24398-CIV, 2013 WL 6667043, at *5, *8-10 (S.D. Fla. Dec. 17, 2013); *True Religion* TRO, at 6-7, 9; *Fujian* TRO,

at 1-5; *Station Casinos, Inc. v. Domain Magic, LLC*, No. 06-CV-01610-RCJ-RJJ, 2006 WL 3838221, at *2 (D. Nev. Dec. 20, 2006); *see also* 15 U.S.C. § 1125(d)(1)(C).

Such an order may be granted *ex parte* upon a showing that: (i) the applicant will provide adequate security; (ii) an order other than an *ex parte* seizure order is not adequate to achieve the purposes of 15 U.S.C. § 1114; (iii) the applicant has not publicized the requested seizure; (iv) the applicant is likely to succeed in showing the defendant is using the counterfeit mark in connection with goods or services; (v) immediate and irreparable harm will occur if the seizure is not ordered; (vi) the materials to be seized will be located at the place identified in the application; (vii) the harm to the applicant in denying the application outweighs the harm to the legitimate interests of the defendant; and (viii) if the applicant were to proceed on notice to the defendant, the defendant or persons acting in concert with defendant would destroy, move, hide, or otherwise make such matter inaccessible to the court.  15 U.S.C. § 1116(d)(4).  As described *infra* and in Plaintiffs' Proposed Order and the accompanying declarations, filed herewith, all of these requirements have been satisfied.  *See infra*, Sections II-V.

### 3. Courts Often Issue *Ex Parte* Relief in Intellectual Property Cases Under Fed. R. Civ. P. 65(b) and 15 U.S.C. § 1116(d).

Courts have repeatedly recognized the need for granting *ex parte* TROs against copyright and trademark infringers.  Indeed, under similar facts, courts have granted interim relief that is even broader than the relief that plaintiffs request here.  *See, e.g.*, *Matter of Vuitton*, 606 F.2d at 3 (citing Fed. R. Civ. P. 65) (issuing writ of mandamus ordering district court to grant *ex parte* relief); *True Religion* TRO, at 9-15; *Fujian* TRO at 6-9; *Century Home Entm't, Inc. v. Laser Beat, Inc.*, 859 F. Supp. 636, 637-38 (E.D.N.Y. 1994); TRO, *Liberty Media Holdings, LLC v. FF Magnat Ltd.*, 12-cv-1057, slip op. at 2-3 (D. Nev. June 21, 2012) (Dkt. No. 11) (hereinafter "*Liberty Media* TRO"); *cf. Vuitton v. White*, 945 F.2d 569 (3d Cir. 1991).

In *Fujian,* for example, an action against a counterfeiting ring selling illegal goods over

the Internet from China to consumers in the United States, the District Court granted an *ex parte* TRO, seizure order, asset restraining order, and a domain-name transfer order, all of which were later continued by a preliminary injunction order.  These orders, *inter alia*:

- enjoined the defendants' infringing activities;

- ordered registrars of the Internet domains used in connection with infringing websites to temporarily disable access to the websites, pending further order of the court; and

- ordered any third-party provider servicing defendants and their web sites— including Internet service providers, hosting providers, and domain name registries—to deliver to plaintiffs copies of documents and records relating to the defendants and their websites, assets, and business operations upon receiving notice of the TRO.

*Fujian* TRO, at 6-9.  The injunction put domain registries and registrars on notice to stop allowing customers to connect to the defendants' websites.  *See* Order, *Fujian*, No. 10-civ-1630, slip op. at 5 (S.D.N.Y. June 24, 2011) (Dkt. No. 56).  The Court held, further, that failing to take corrective action once on notice would constitute aiding and abetting the defendants' unlawful activities and would violate the injunction.  *Id.*  Since *Fujian*, courts in this District have continued to grant similar relief in other trademark and counterfeiting cases.  *See, e.g.*, *True Religion* TRO, at 10-11, 14-15; TRO, *Nat'l Football League v. Cheng d/b/a nfljerseydiscount.com*, No. 11-cv-344 (WHP), slip op. at 8, 12-13 (S.D.N.Y. Jan. 19, 2011) (Dkt. No. 7) (hereinafter "*NFL* TRO"); *see also* TRO, *PRL USA Holdings, Inc. v. Kiat*, No. 10-cv-6456 (PGG), slip op. at 8 (S.D.N.Y. Sept. 1, 2010) (Dkt. No. 11).

Courts have also granted *ex parte* TROs in comparable copyright infringement cases.  In *Liberty Media*, for example, the plaintiff claimed that the operator of an online storage service known as a "cyberlocker" was directly and secondarily liable for copyright infringement because users used the cyberlocker service to upload and share unauthorized digital copies of the plaintiffs' motion pictures.  The District Court of Nevada issued an *ex parte* TRO ordering the

domain name registry VeriSign to freeze the defendant's domain name to prevent it from being transferred. *Liberty Media* TRO, at 2-3. Other courts have used their inherent authority to issue similar interim relief in copyright cases. *See, e.g.*, *True Religion* TRO, at 14-15; *cf.* Order, *Datatech Enters. v. FF Magnat Ltd*, No. 12-cv-4500, at 2-3 (N.D. Cal. Aug. 28, 2012) (Dkt. No. 9).

        **C.**    ***Ex Parte* Relief is Essential.**

The extraordinary circumstances of this case demonstrate that good cause exists for granting the *ex parte* relief requested. Indeed, for a TRO to be effective at all, the Court must grant Plaintiffs' application *ex parte*.

        1.  <u>If Notice is Given, the Defendants Will Disappear and Move All of Their Operations Outside the United States, Rendering Plaintiffs' Enforcement Efforts Futile and Disturbing the Status Quo.</u>

Courts have recognized that a preliminary injunction is insufficient in cases involving anonymous online infringers who have taken steps to move their businesses beyond the reach of judicial process. Indeed, courts regularly issue *ex parte* orders in recognition of the covert nature of online counterfeiting activity and the need to establish an economic disincentive for trademark counterfeiting. *See supra*, Section I(B)(3).

Here, Defendants operate in the shadows of the Internet via aliases and with the flexibility to move their operations anywhere in the world—and thereby to evade this Court's jurisdiction—in an instant. Given the Internet's ephemeral nature and online infringers' ability to elude identification, advanced notice to these Defendants would provide them with an opportunity to disappear to new jurisdictions and to revive their infringing activities under new online aliases, using new servers and other infrastructure. *See* McDevitt Decl. ¶¶ 25-26; *see also id.* ¶ 19.

Indeed, the danger of providing advance notice to Defendants of the relief requested

herein is particularly acute and tangible.  Defendants have already moved their Download Server

to a new host in a foreign jurisdiction within mere hours of receiving notice of a copyright

complaint sent to one of its Internet service providers.  *Id.* ¶ 19.  Advanced notice of a TRO here

would allow Defendants to take further steps to evade jurisdiction, such as an attempt to transfer

their Grooveshark.io and Grooveshark.pw domain names to registrars outside the United States.

*See id.* ¶¶ 25-26.  In short, with notice, Defendants could render this action meaningless before

the Court would be able to adjudicate the parties' respective rights.

Accordingly, this Court should enter an *ex parte* TRO freezing the Infringing Domain

Names and ordering Defendants and their domain registrar to render the Infringing Domain

Names inaccessible during the pendency of this action, thus preventing any further illegal use or

migration of the Infringing Domain Names and thereby maintaining the status quo.  To render

the Infringing Domain Names inaccessible, Plaintiffs request an order requiring Defendants'

domain registrar, Namecheap, Inc., to change the authoritative name-servers for the Infringing

Domain Names to name-servers controlled by Plaintiffs pending further direction from this

Court.  Similar remedies have been imposed through *ex parte* TROs in other cases.  *See, e.g.*,

*Adidas AG*, 2013 WL 6667043, at *10; *Microsoft Corp. v. Does 1-8*, No. 13-CV-1014, slip op. at

12 (W.D. Tex. Nov. 25, 2013).

2.   Plaintiff UMG Meets the Criteria for Issuance of a Seizure Order *Ex Parte*.

Plaintiff UMG meets each of the criteria for issuance of an *ex parte* seizure order

required by the Lanham Act.  *See* 15 U.S.C. § 1116(d)(4); *see also supra*, Section I(B)(2).  First,

Plaintiffs have indicated their willingness and ability to provide a bond to the Court in

conjunction with the *ex parte* relief that they seek.  *See* Plfs.' [Proposed] Order, filed herewith.

Second, an order other than an *ex parte* seizure order is not adequate to achieve the purposes of

15 U.S.C. § 1114 because, as explained above, advanced notice would allow Defendants to elude

the jurisdiction of this Court and to continue to operate the Counterfeit Service, in violation of

UMG's rights under 15 U.S.C. § 1114.  *See supra*, Section I(C)(1).  <u>Third</u>, Plaintiffs have not

publicized that they are seeking the relief requested in the Order.  McDevitt Decl. ¶ 24;

Servodidio Decl. ¶ 23.  <u>Fourth</u>, as elaborated further *infra*, UMG has submitted evidence to show

that Defendants are using a counterfeit mark in connection with the Counterfeit Service.  *See*

*infra*, Section II(A); Servodidio Decl. ¶¶ 3, 18 & Exs. A, F.  <u>Fifth</u>, as Plaintiffs demonstrate

*infra*, UMG will suffer irreparable injury if seizure of the Infringing Domain Names is not

ordered.  *See infra*, Section III.  <u>Sixth</u>, Plaintiffs have demonstrated that Defendants are operating

the Counterfeit Service through the Infringing Domain Names, which have been registered

through a registrar located in the United States.  McDevitt Decl. ¶¶ 9-10.  <u>Seventh</u>, as Plaintiffs

establish *infra*, the harm in denying the application outweighs any legitimate interests of

Defendants.  *See infra*, Section IV.  <u>Eighth</u>, as shown above, Defendants have gone to great

lengths to conceal their true identities and are doing business only over the Internet.  McDevitt

Decl. ¶¶ 10-11, 16, 22; *see also supra*, Section I(C)(1).  Defendants can easily change their

assumed identities and move their illegal operations entirely overseas if given advanced notice.

*Id.* ¶¶ 19, 25.  If this occurs, UMG will be unable to effectively enforce its rights and thus will

suffer irreparable injury.  *See supra*, Section I(C)(1).

**II.      Plaintiffs are Highly Likely to Succeed on the Merits of Their Claims.**

      **A.      Plaintiff UMG is Likely to Succeed on the Merits of its Counterfeiting and
Trademark Claims.**

            1.   <u>Defendants Infringe Plaintiff UMG's Exclusive Trademark Rights Under
Sections 32 and 43(a) of the Lanham Act.</u>

Liability for trademark infringement attaches under Section 32 of the Lanham Act if a

defendant uses any reproduction, counterfeit, copy, or colorable imitation of a registered mark in

commerce without authorization, and that use is likely to cause confusion, mistake, or deception.

15 U.S.C. § 1114.  To succeed on the merits, UMG must demonstrate (1) ownership of the

trademarks at issue; (2) that Defendants' use of the marks is without UMG's permission; and (3)

that Defendants' use is likely to cause confusion, mistake, or deception as to the source,

affiliation, or sponsorship of the Defendants' services.  *See id.* §§ 1114, 1125(a).[6]

> a.  *Plaintiff UMG Owns the Valid and Protectable Grooveshark Marks.*

Plaintiff UMG is the owner of all right, title, and interest in the Grooveshark Marks in

connection with the same services being offered by Defendants under their counterfeit marks;

namely, an online music streaming site.  Schmidt Decl. ¶¶ 6-7.  This registration is *prima facie*

evidence of the validity of the Grooveshark Marks, as well as of UMG's exclusive right to use its

marks in commerce in connection with the goods or services specified in the registration.  *See* 15

U.S.C. § 1057(b); *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 631 F. Supp. 735, 740

(S.D.N.Y. 1985).  UMG has thus sufficiently demonstrated a likelihood that it will prevail in

showing its ownership of the Grooveshark Marks and that these Marks are protectable.

> b.  *Consumers Are Likely to Be Confused as to the Source of Defendants'*
> *Counterfeit Service.*

Courts in this District have found that, "where counterfeit marks are involved, it is not

necessary to perform the step-by-step examination of each *Polaroid* factor because counterfeit

marks are inherently confusing."[7]  *Lorillard Tobacco Co. v. Jamelis Grocery, Inc.*, 378 F. Supp.

---

[6] Under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), a defendant is liable for false designation of origin if the public is likely to be confused, mistaken, or deceived by the similarity of the marks at issue. *Nikon Inc. v. Ikon Corp.*, 987 F.2d 91, 94 (2d Cir. 1993).  Regardless of what the violation is called—infringement, unfair competition, or false designation of origin—the test is the same under both Sections 32 and 43(A).  *Time, Inc. v. Petersen Publ'g Co.*, 173 F.3d 113, 117 (2d Cir. 1999).  Because UMG is likely to succeed on the merits of its trademark counterfeiting and infringement claim against Defendants under Section 32 of the Lanham Act, it is also likely to succeed on its second claim under Section 43(a).  *See id.*; *Nikon Inc.*, 987 F.2d at 94.

[7] In the Second Circuit, likelihood of confusion is assessed under the following, non-exclusive eight factors, known as the "*Polaroid*" test: (1) the strength of the Plaintiffs' mark; (2) the degree of similarity between the plaintiff's and defendant's marks; (3) the proximity of the products; (4) the likelihood that the senior user will bridge the gap; (5) the sophistication of the buyers; (6) the quality of the defendant's

2d 448, 455 (S.D.N.Y. 2005) (citations and internal quotation marks omitted).  This is because "confusing the customer is the whole purpose of creating counterfeit goods [or services]."  *Gucci Am., Inc. v. Duty Free Apparel, Ltd.*, 286 F. Supp. 2d 284, 287 (S.D.N.Y. 2003).

A counterfeit mark is a spurious mark that (1) is identical to or substantially indistinguishable from a registered mark that is in use; (2) is being used for the same goods and services as the plaintiff's mark; and (3) is being used without the authorization of the owner of the mark.  *See* 15 U.S.C. §§ 1116(d) & 1127.  Defendants plainly are using counterfeits of the Grooveshark Marks.  As a simple visual comparison confirms, Defendants have adopted identical copies of the Grooveshark Marks for the identical service—a music streaming website—without UMG's permission, and are attempting to pass off their service as the "new Grooveshark.com."  *See supra*, at 2-3.  Thus, Defendants' use of the counterfeit mark is "inherently confusing."  *Lorillard Tobacco Co.*, 378 F. Supp. 2d at 455.  In fact, Defendants' efforts have succeeded in causing actual confusion among Internet users.  *See supra*, at 11.  UMG has thus demonstrated a likelihood of succeeding on the merits of its trademark infringement claims under Sections 32 and 43(a) of the Lanham Act.

2.   Defendants are Cybersquatting Under Section 43(d) of the Lanham Act.

The Anticybersquatting Consumer Protection Act of 1996 ("ACPA") applies when a domain name registrant has a bad faith intent to profit from a domain name that "is identical to or confusingly similar to or dilutive of" a distinctive mark that belongs to someone else.  15 U.S.C. § 1125(d).  In such cases, in addition to other damages, "a court may order the forfeiture or cancellation of the domain name or the transfer of the domain name to the owner of the mark." *Id.*  The ACPA aims to prevent cybersquatters from capitalizing on consumer confusion by

---

product; (7) actual confusion; and (8) the defendant's intent in adopting the mark used.  *Polaroid Corp. v. Polarad Elecs. Corp.,* 287 F.2d 492, 495 (2d Cir. 1961), *cert. denied,* 368 U.S. 820 (1961); *see also Banff, Ltd. v. Federated Dep't Stores, Inc.*, 841 F.2d 486, 489 (2d Cir. 1988).

diverting customers from the mark owner's site to their own.  *Lucas Nursery & Landscaping, Inc. v. Grosse*, 359 F.3d 806, 809 (6th Cir. 2004); *see also Diarama Trading Co., Inc. v. J. Walter Thompson U.S.A., Inc.*, No. 01 Civ. 2950, 2005 WL 2148925, at *12 (S.D.N.Y. Sept. 6, 2005).  Defendants have engaged in precisely such behavior.

a.  <em>UMG's Marks Are Distinctive.</em>

Registered trademarks, such as the Grooveshark Marks, are presumed to be distinctive. *See* 15 U.S.C. § 1115(a).  Here, the Grooveshark Marks are inherently distinctive as they are fanciful in nature and do not describe the services at issue.  *See TCPIP Holding Co., Inc. v. Haar Commc'ns, Inc.*, 244 F.3d 88, 94 (2d Cir. 2001); s*ee generally Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9-11 (2d Cir. 1976) (discussing scale of inherent distinctiveness).  Moreover, the Grooveshark Marks have achieved a high level of recognition in the marketplace based on widespread use, advertising and promotion.  *See* McDevitt Decl. ¶ 3.

b.  <em>The Infringing Domain Names are Identical to UMG's Grooveshark Word Mark.</em>

Defendant has registered and is using the Infringing Domain Names Grooveshark.io and Grooveshark.pw containing the identical Grooveshark Word Mark.  That the domain names are confusingly similar to UMG's Grooveshark Word Mark is manifest as they contain the same mark and are used to identify a counterfeit service, which depends on customer confusion. Moreover, courts have found that it is irrelevant that there may be slight differences between a domain name and a registered mark, such as typos, the addition of minor or generic words, or different top-level domain (*i.e.*, ".com" as compared to ".io" or ".pw").  *See TCPIP Holding*, 244 F.3d at 101.

c.  <em>Defendants Have the Bad Faith Intent to Profit from UMG's Grooveshark Mark.</em>

The ACPA lists nine non-exclusive factors for courts to consider in determining whether

24

a domain name has been registered or used in "bad faith" with an intent to profit from a mark in

registering or using the mark in a domain name.  *See* 15 U.S.C. § 1125(d)(1)(B)(i).  These factors

include:

> (i) the trademark or other intellectual property rights of the person, if any, in the domain name;
>
> (ii) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;
>
> (iii) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;
>
> (iv) the person's bona fide noncommercial fair use of the mark in a site accessible under the domain name;
>
> (v) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation or endorsement of the site;
>
> (vi) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;[8]
>
> (vii) the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;
>
> (viii) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and

---

[8] This factor is not applicable here as the Defendants are actively exploiting the Infringing Domain Names for their Counterfeit Service. As courts have recognized, these factors are not applied rigidly, but rather as a guide for the court to determine whether the conduct at issue is motivated by a bad faith intent to profit. *Lucas Nursery and Landscaping, Inc. v. Grosse*, 359 F.3d 806, 811 (6th Cir. 2004).  Here, the motivation is clearly brazen infringement of the Grooveshark Marks.  *See supra*, at 9-10.

(ix) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous[.]

*Id.* Furthermore, using a trademark owner's mark in registering a domain name for a website offering counterfeit goods or services is a particularly egregious form of bad faith. *Cf. Tiffany (NJ) LLC v. Dong*, No. 11 Civ. 2183(GBD)(FM), 2013 WL 4046380, *2, *6 (S.D.N.Y. Aug. 9, 2013) (assessing damages for willful infringement); *Louis Vuitton Malletier & Oakley, Inc. v. Veit*, 211 F. Supp. 2d 567, 584-85 (E.D. Pa. 2002) (same).

Applying the relevant factors here, it is clear that UMG will be able to demonstrate Defendants' bad faith intent: (1) Defendants have no *bona fide* trademark rights in the registered domain names at issue, *see supra*, at 6-7; (2) the Infringing Domain Names do not contain any of Defendants' legal names; (3) Defendants have not engaged in any prior, *bona fide* use of the Infringing Domain Names but rather adopted these names within the past eleven days to promote a blatantly infringing download/streaming service, and thereby frustrate Plaintiffs' multi-year enforcement efforts against the former operators of Grooveshark, *see supra*, at 9-11; (4) Defendants are not engaged in any *bona fide* noncommercial or fair use of the Infringing Domain Names, *id.*; (5) by using marks identical to UMG's distinctive trademarks in the domain name for their infringing site, Defendants intend to divert consumers to the Counterfeit Service and to create a likelihood of confusion as to the source, sponsorship, affiliation or endorsement of the Counterfeit Service, thus unquestionably harming the goodwill and reputation associated with UMG's trademarks, *see supra*, at 9-11, 21-23; (6) Defendants are most likely intentionally maintaining false contact information, *see* McDevitt Decl. ¶ 11; (7) Defendants have registered multiple domain names, *see id.* ¶ 9; and (8) the marks contained in the domain names at issue are confusingly similar to the distinctive Grooveshark Word Mark as discussed above, *see supra*, at 21-23.  Accordingly, Plaintiffs have established that Defendants had the requisite bad faith intent

to profit from the registration of domain names confusingly similar to UMG's trademarks.

      **B.**      **Plaintiffs are Likely to Succeed on the Merits of Their Copyright Claims.**

          1.   <u>Defendants Directly Infringe Plaintiffs' Copyrights.</u>

Plaintiffs are likely to succeed on the merits of their direct copyright infringement claims—indeed, their claims are beyond dispute.  Plaintiffs need only show two elements for direct infringement:  (1) that they own valid copyrights in the sound recordings at issue (the "Works-in-Suit"), and (2) that Defendants engaged in the reproduction, distribution, and/or public performance of copies of the Works-in-Suit via the Counterfeit Service without authorization from Plaintiffs.  *See Arista Records, LLC v. Doe 3*, 604 F.3d 110, 117 (2d Cir. 2010); *Arista Music*, 2014 WL 5089743, at *19-21; *see also EMI*, 2015 WL 1402049, at *38-39.

Plaintiffs' ownership is conclusively established by the Declarations in support of this Motion.  Plaintiffs are the owners or exclusive licensees of copyrights in the Works-in-Suit listed in Exhibit E to the Complaint, each of which is the subject of a certificate of registration from the U.S. Copyright Office.  *See* Schmidt Decl., Ex. A; Leak Decl., Ex. A; Hochberg Decl., Ex. A. Such registrations are *prima facie* evidence of valid copyright ownership.  *See, e.g.*, *Rogers v. Koons*, 960 F.2d 301, 306 (2d Cir. 1992).

Moreover, it cannot be disputed that Defendants are engaged in the unauthorized reproduction, distribution, and public performance of infringing copies of Plaintiffs' sound recordings.  As demonstrated in the Declaration of Mark McDevitt, Plaintiffs have verified that infringing copies of MP3 files that correspond to each of the Works-in-Suit have been streamed, reproduced, and distributed via the Counterfeit Service to computers located in New York. McDevitt Decl. ¶¶ 26-28.  This constitutes direct infringement of Plaintiffs' exclusive rights under the Copyright Act.  *See, e.g.*, *EMI*, 2015 WL 1402049, at *42-43; *Arista Music*, 2014 WL 5089743, at *19-21; *Capitol Records, LLC v. ReDigi Inc.*, 934 F. Supp. 2d 640, 648-52

(S.D.N.Y. 2013); *Columbia Pictures Indus., Inc. v. Fung*, 710 F.3d 1020, 1034 (9th Cir. 2013).

### 2.  Defendants Secondarily Infringe Plaintiffs' Copyrights.

Plaintiffs are also likely to succeed on the merits of their secondary infringement claims. Indeed, two courts in this District have already held that the original Grooveshark music service, upon which the Counterfeit Service is based, secondarily infringed Plaintiffs' sound recording copyrights.  *EMI*, 2015 WL 1402049, at *41-44; *Arista Music*, 2014 WL 5089743, at *19-21.

Repeated and pervasive downloading of sound recordings by the users of the Counterfeit Service constitutes direct infringement.  *See Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 929-930 (2005).  Defendants are secondarily liable for this infringement under the theories of vicarious liability, contributory liability, and inducement of infringement. *See id.* at 930, 934-35 (recognizing separate doctrines).

### a.  *Defendants are Vicariously Liable for Copyright Infringement.*

Parties are vicariously liable for copyright infringement when they "profit[] from direct infringement while declining to exercise a right to stop or limit it."  *Id.* at 930; *EMI*, 2015 WL 1402049, at *41-43; *Arista Records LLC v. Lime Grp. LLC* ("*LimeWire*"), 784 F. Supp. 2d 398, 423 (S.D.N.Y. 2011).  All that is required to satisfy this element is "a causal relationship between the infringing activity and any financial benefit a defendant reaps, regardless of *how substantial* the benefit is in proportion to a defendant's overall profits."  *Ellison v. Robertson*, 357 F.3d 1072, 1079 (9th Cir. 2004) (emphasis in original); *Arista Records LLC v. Usenet.com, Inc.*, 633 F. Supp. 2d 124, 157 (S.D.N.Y. 2009).  This relationship is established when the infringing material acts as a "draw" to attract users.  *Usenet*, 633 F. Supp. 2d at 156-57.

Here, infringing content is a substantial—and likely the only—draw to the Counterfeit Service.  As noted above, Plaintiffs' sound recordings featured on the Counterfeit Service include well-known and popular sound recordings, including songs by Beyoncé, Bob Marley,

Green Day, Lady Gaga, and Michael Jackson.  Servodidio Decl. ¶ 10; *see also* McDevitt Decl.

Ex. J.  Defendants use these and other popular sound recordings to attract users to the service.

Indeed, Defendants claim to have copied ninety percent of the Grooveshark music service's

content, announcing to search engines that "GrooveShark.io is a web-based music application

built for anyone on the internet to listen to music on-demand at no charge, New

Grooveshark.com."  *Supra*, at 10-11; McDevitt Decl., Exs. D-G.

> b.  *Defendants are Liable for Inducement of Copyright Infringement.*

To establish inducement, Plaintiffs must show that Escape: "(1) engaged in purposeful

conduct that encouraged copyright infringement, with (2) intent to encourage such

infringement."  *LimeWire*, 784 F. Supp. 2d at 425; *Usenet*, 633. F. Supp. 2d at 150-52 (same).

Defendants unquestionably operate the Counterfeit Service with the object of promoting

its use to infringe, and knowingly and intentionally take steps that are substantially certain to

result in infringement.  Not only do Defendants specifically invite users to stream popular and

obviously copyrighted sound recordings on demand, but they also prominently encourage users

to download unauthorized copies of those sound recordings with ease.  *See supra*, at 10-11.

> c.  *Defendants Have Engaged in Contributory Copyright Infringement.*

In the Second Circuit, "one who, with knowledge of the infringing activity, induces,

causes, or materially contributes to the infringing conduct of another, may be held liable as a

contributory infringer."  *Arista Records, LLC v. Doe 3*, 604 F.3d at 117-18 (internal quotation

and citation omitted); *see EMI*, 2015 WL 1402049, at *43.  The relevant inquiry is whether the

parties "know *or have reason to know*" of the direct infringement.  *A&M Records, Inc. v.

Napster, Inc.*, 239 F.3d 1004, 1020 (9th Cir. 2001) (emphasis added).  Here, Defendants have

actual and constructive knowledge of the infringing activity of the Counterfeit Service's users.

*Supra*, at 10-11.  The second requirement, material contribution, requires only that a defendant

engage in personal conduct that encourages or assists infringement. *Napster*, 239 F.3d at 1019.

That requirement is easily met here, as Defendants knowingly caused and materially contributed

to users' infringement by providing the means to search the Counterfeit Service for copyrighted

music files and by providing the means to stream and download those. *See supra*, at 10-11;

McDevitt Decl., Exs. D-G.

## III.    Injunctive Relief is Necessary to Prevent Irreparable Harm.

In the absence of a TRO, Plaintiffs face the immediate prospect of immense and

irreparable harm.  Without the interim relief requested, Defendants will continue—and, indeed,

broaden—their brazen infringement of UMG's Grooveshark Marks and Plaintiffs' copyrights

through the Counterfeit Service.  In fact, Defendants' Counterfeit Service already has attracted

large number of users, and Defendants have threatened that "Grooveshark[.io] will end up

becoming way better and stronger than it ever was." *Id.*, Ex. G.

### A.    Defendants' Trademark Infringement Will Cause Irreparable Harm.

Irreparable damage to a trademark owner sufficient to justify a preliminary injunction

may be shown through threatened loss of good will and loss of ability to control the owner's

reputation. *Marks Organization, Inc. v. Joles*, 784 F.Supp.2d 322, 335 (S.D.N.Y. 2011); *N.Y.

City Triathlon, LLC v. NYC Triathlon Club, Inc.*, 704 F. Supp. 2d 305, 343 (S.D.N.Y. 2010); *see

also Home Box Office, Inc. v. Showtime/The Movie Channel, Inc.*, 832 F.2d 1311, 1314-15 (2d

Cir. 1987); *Paco Rabanne Parfums, S.A. v. Norco Enters.*, 680 F.2d 891, 894 (2d Cir. 1982).

Moreover, "a particularly strong likelihood of confusion should weigh in favor of finding

irreparable injury." *Joles*, 784 F. Supp. 2d at 334 (citing *Salinger v. Colting*, 607 F.3d 68, 81 (2d

Cir. 2010)).  This is because where there is a strong likelihood of confusion, "the reputation and

goodwill cultivated by [the trademark owner] would be out of its hands," especially where the

infringer's "product may or may not be of high quality, sold with sufficient care to customer

service, or convey the same branding image." *U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc.*, 800 F.Supp.2d 515, 541 (S.D.N.Y. 2011).

Here, Defendants' use of copies of the Grooveshark Marks for their "copycat" service threatens to destroy the reputation and goodwill associated with the Grooveshark Marks and undermines their commercial value to UMG.  Schmidt Decl. ¶ 10.  Moreover, UMG has demonstrated a particularly strong likelihood of confusion, and, indeed, *actual* customer confusion.  *See supra*, at 9-11 & Section II(A)(1).  Having demonstrated these threats and a strong likelihood of confusion, *see supra*, Section II(A)(1), UMG has established irreparable harm.

### B.    Defendants' Copyright Infringement Will Cause Irreparable Harm.

Similarly, "'[a] plaintiff has no adequate remedy at law where, absent an injunction, the defendant is likely to continue infringing its copyright(s).'"  *Complex Sys., Inc. v. ABN AMRO Bank N.V.*, No. 08-cv-7497, 2014 WL 1883474, at *11 (S.D.N.Y. May 9, 2014) (quoting *Hounddog Prods., L.L.C. v. Empire Film Grp., Inc.*, 826 F. Supp. 2d 619, 634 (S.D.N.Y. 2011)).

Absent an injunction, plaintiffs would suffer a severe hardship as a result of Defendants' infringement.  "[T]he fact that [p]laintiffs' [works] can be replicated into infinity, for free, establishes that a distinct hardship rests with [p]laintiffs."  *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 518 F. Supp. 2d 1197, 1220 (C.D. Cal. 2007) (quoting *UMG Recordings, Inc. v. Blake*, No. 5:06-CV-00120, 2007 WL 1853956, at *3 (E.D.N.C. June 26, 2007)).

Indeed, the injuries to Plaintiffs' businesses that are threatened here are quintessentially irreparable.  It is axiomatic that the availability of free, infringing copies of Plaintiffs' works through the Counterfeit Service irreparably undermines the growing legitimate market for consumers to purchase access to the same works.  *See, e.g.*, *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 928-29 (2005) ("digital distribution of copyrighted material

threatens copyright holders as never before, because every copy is identical to the original, copying is easy, and many people (especially the young) use file-sharing software to download copyrighted works"); *A&M Records, Inc.*, 239 F.3d at 1017 (citing "Napster's deleterious effect on the present and future digital download market").

Here, Plaintiffs' businesses depend critically on licensing to online streaming services the right to use Plaintiffs' music catalogs.  If customers can instead download and stream Plaintiffs' complete catalogs for free and without restriction from the Counterfeit Service, customers will have little incentive to purchase music or pay for the streaming services on which Plaintiffs' businesses rely.  Schmidt Decl. ¶ 11.  As a result, Defendants' Counterfeit Service will depress Plaintiffs' ability to charge a fair market rate for its music, as all of their licensees will have to compete with a service that pays no license fees.  Defendants' Counterfeit Service thus destroys Plaintiffs' actual and potential business relationships and engages in "direct competition" with Plaintiffs' licensed products.  *Complex Sys.*, 2014 WL 1883474, at *12.  These are classic irreparable harms.  *See Ticor Title v. Cohen*, 173 F.3d 63, 69 (2d Cir. 1999); *Complex Sys.*, 2014 WL 1883474, at *12.[9]

Moreover, the harm that Plaintiffs have suffered as a result of users downloading and streaming Plaintiffs' songs through the Counterfeit Service, while surely vast, is ultimately incalculable.  *Cf. Nat'l Football League v. Primetime 24 Joint Venture*, 131 F. Supp. 2d 458, 472 (S.D.N.Y. 2001) (noting that in providing for statutory damages, the Copyright Act recognizes

---

[9] In addition, Defendants are intentionally seeking to attract millions of former users of the Grooveshark music service to the Counterfeit Service where infringing copies of the UMG Plaintiffs' sound recordings can be streamed and downloaded.  As noted above, the settlement agreement between Plaintiffs and Escape required Escape to direct users of the Grooveshark music service to Plaintiffs' legitimate streaming partners.  By diverting users from the Grooveshark Music Service to the Counterfeit Service during this critical time period, Defendants are threatening to eviscerate a critical component of the settlement agreement with Escape and will perpetuate the massive and ongoing infringement of the UMG's Plaintiffs' copyrights by millions of users.  Schmidt Decl. ¶ 12.

there are situations when actual damages are difficult to calculate and prove).  Where, as here, damages are difficult to establish and measure, the harm is considered irreparable.  *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004).

## IV.     The Balance of the Hardships Strongly Favors Plaintiffs.

Plaintiffs have established "both a likelihood of success on the merits and irreparable harm," and injunctive relief is necessary to protect Plaintiffs against all of the harms identified above—harms that go to the very core of Plaintiffs' businesses.  *WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275, 287 (2d Cir. 2012), *cert. denied*, 133 S. Ct. 1585 (2013).

The harm to Plaintiffs' trademarks and copyrights that will occur if the application is denied greatly outweighs the harm to Defendants' interests in continuing to provide the Counterfeit Service.  Defendants will suffer no legitimate hardship in the event this Court issues a TRO, because Defendants have no right to engage in their present activities, and "an infringer of copyright cannot complain about the loss of ability to offer its infringing product."  *Id.* (quotation marks omitted); *see also CJ Prods. LLC v. Snuggly Plushez LLC*, 809 F. Supp. 2d 127, 146 (E.D.N.Y. 2011) ("One who elects to build a business on a product found to infringe cannot be heard to complain if an injunction against continuing infringement destroys the business so elected").  Given "the probable outcome of this action, this is a loss which [Defendants] may justifiably be called upon to bear." *Corning Glass Works v. Jeanette Glass Co*., 308 F. Supp. 1321, 1328 (S.D.N.Y. 1970), *aff'd*, 432 F.2d 784 (2d Cir. 1970).

## V.      The Relief Requested Will Not Harm the Public Interest.

The public interest supports the relief sought here.  *Salinger*, 607 F.3d at 80.[10]  It is

---

[10] "The 'public interest' prong does not mean that a court must consider the public interest in deciding *whether* to grant injunctive relief; rather, it means that if injunctive relief is granted, a court should ensure that the injunctive provisions of the order do not harm the public interest." *Briggs &*

axiomatic that the public has a strong interest in not being misled as to the origin, source, or sponsorship of trademarked products. *Scarves by Vera, Inc. v. Todo Imports Ltd.*, 544 F.2d 1167 (2d Cir. 1976). Moreover, trademark infringement involving a domain name constitutes a "misuse of the Internet, which is a resource that has the potential to benefit hundreds of millions of people. There is a strong public interest in stopping such misuses." *Minn. Mining & Mfg. Co. v. Taylor*, 21 F. Supp. 2d 1003, 1005 (D. Minn. 1998).

Furthermore, "the public has a compelling interest in protecting copyright owners' marketable rights to their work and the economic incentive to continue creating" those works. *WPIX*, 691 F.3d at 287. That is because "[i]nadequate protections for copyright owners can threaten the very store of knowledge to be accessed; encouraging the production of creative work thus ultimately serves the public's interest in promoting the accessibility of such works." *Id.*

The balance of hardships therefore heavily favors the issuance of immediate injunctive relief.

## VI.     Defendants are Subject to Personal Jurisdiction.

Defendants are all subject to personal jurisdiction in New York, and thus this Court has jurisdiction to order the requested relief. Assessing personal jurisdiction requires a two-part analysis, examining (1) whether there is jurisdiction over the defendant under New York's long arm statute, and (2) whether exercising jurisdiction is consistent with federal due process requirements. *Grand River Enters. Six Nations, Ltd. v. Pryor*, 425 F.3d 158, 165 (2d Cir. 2005); *accord Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163-64 (2d Cir. 2010).

### A.     Defendants' Conduct Renders Them Subject to This Court's Personal Jurisdiction Under New York's Long Arm Statute.

Courts in New York have personal jurisdiction over a defendant who commits a tort

---

*Stratton*, 2013 WL 3972391, at *1 n.4; *see Citigroup*, 673 F.3d at 163 n.1. Regardless, for the reasons stated herein, the public interest strongly supports injunctive relief.

outside of New York that causes harm inside of New York.  *See* N.Y. C.P.L.R. § 302(a)(3)(ii).

To establish jurisdiction under N.Y. C.P.L.R. § 302(a)(3)(ii), Plaintiffs must show that: "(1) the

defendant committed a tortious act outside New York; (2) the cause of action arose from that act;

(3) the tortious act caused an injury to a person or property in New York; (4) the defendant

expected or should have reasonably expected the act to have consequences in New York; and (5)

the defendant derived substantial revenue from interstate or international commerce."  *Penguin

Grp. (USA) Inc. v. Am. Buddha*, 16 N.Y.3d 295, 302 (2011).  All five elements are met here.

        The first two elements of jurisdiction under § 302(a)(3)(ii) are clearly demonstrated.

Undeniably, as Plaintiffs have alleged, (1) Defendants have committed tortious acts outside the

state and (2) those acts are the basis for Plaintiffs' federal trademark and copyright claims.  *See*

Compl. ¶ 16; *see also supra*, Section III.

        With respect to the third element, the situs of the injury suffered as a result of

Defendants' tortious actions is New York.  As set forth in the accompanying declarations,

Plaintiffs maintain either their headquarters or substantial business offices in New York.  Leak

Decl. ¶ 3; Hochberg Decl. ¶ 3; Schmidt Decl. ¶ 3.  As such, Plaintiffs have suffered injury within

this state.  *See Penguin Group (USA) Inc. v. Am. Buddha*, 16 N.Y.3d 295, 302 (2011) (holding

the situs of the injury for purposes of determining long-arm jurisdiction is the "location of the

copyright holder");[11] *PDK Labs, Inc. v. Proactive Labs, Inc.*, 325 F. Supp. 2d 176, 181

(E.D.N.Y. 2014) ("an injury within the state includes harm and threatened harm in the New York

market"); *Savage Universal Corp. v. Grazier Constr., Inc.*, No. 04 Civ. 1089, 2004 WL 1824102,

---

[11] The *Penguin* court reasoned that: (1) where the locus of the injury cannot be circumscribed to a
specific geographic area, the location of the infringement is of little import, inasmuch as the aim of the
infringer is to make the copyrighted works available in multiple locations, including in New York, *id.* at
304-05; and (2) there is a direct injury in New York because the violation of the New York copyright
holder's right to exclude others from using the property diminishes the incentive to create copyrighted
works and causes irreparable harm through possible market confusion, *id.* at 305-07.

at *9 (S.D.N.Y. 2004) (holding the situs of injury is where the trademark owner "conducts business").

With respect to the fourth element, Defendants not only should have reasonably expected that their counterfeit use of the Grooveshark Marks and infringement of Plaintiffs' copyrights would cause injury and have consequences in New York, but they *intended* to cause such injury in this state.  As noted above, Plaintiffs had sued Escape in three separate actions in New York and obtained well-publicized consent judgments from those New York state and federal courts. Defendants launched the Counterfeit Service in direct response to those judgments, and Defendants have brazenly acknowledged the illegality of their conduct and the likelihood of copyright enforcement actions against them.[12]  *See supra*, at 5, 9-10.

Finally, the fifth element—that defendants derive substantial revenue from interstate commerce—is intended to preclude jurisdiction over non-domiciliaries "whose business operations are of a local character."  *Ingraham v. Carroll*, 90 N.Y.2d 592, 599 (1997) (internal quotations omitted).  Here, there is no question that the Counterfeit Service is an interstate— indeed, a global—operation and not a "local business."  Every sound recording on the Counterfeit Service is publicly available to anyone with an Internet connection and, thus, the audience for those infringing sound recordings includes millions of U.S. users.  Indeed, as alleged in the Complaint, Defendants purport to have resurrected the original Grooveshark music service, which generated substantial revenues in commerce via the publication of advertisements. Compl. ¶ 9.  Defendants' Counterfeit Service indicates that it serves advertisements on users via

---

[12] Courts apply an objective test in determining whether a defendant expects or should reasonably expect his act to have consequences within New York.  *Energy Brands Inc. v. Spiritual Brands, Inc.*, 571 F. Supp. 2d 458, 467-68 (S.D.N.Y. 2008).  Courts have held that "it is reasonably foreseeable that the provision of [goods or services] that infringe the copyrights and trademarks of a New York company will have consequences in New York."  *McGraw-Hill Cos., Inc. v. Ingenium Techs. Corp.*, 375 F. Supp. 2d 252, 256 (S.D.N.Y. 2005); *see Citigroup Inc. v. City Holding Co.*, 97 F. Supp. 2d 549, 568 (S.D.N.Y. 2000).

the Google Ads service.  Servodidio Decl., Ex. G (Grooveshark.io Privacy Policy).  Moreover, the Counterfeit Service solicits advertisements via the "Contact Us" page, providing a link to email for "Advertisement Enquiries."  *Id.*, Ex. H.  Accordingly, Defendants are inherently engaged in interstate commerce.

### B.      The Exercise of Jurisdiction Over Defendants Comports with the Requirements of Due Process.

The assertion of personal jurisdiction over Defendants also fully comports with due process because (1) defendant has "minimum contacts" with the forum state and (2) the assertion of personal jurisdiction in these circumstances is consistent with traditional notions of "fair play and substantial justice."  *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985).

As described above, Defendants have purposefully directed their tortious conduct at Plaintiffs in New York, and in direct response to judgments issued by federal and state courts in New York, such that Defendants reasonably anticipated—and indeed expected—to be sued here. *Supra*, at 35-36.  Defendants' willful infringement of Plaintiffs' rights also satisfies the purposeful availment requirement.  *See Columbia Pictures Television v. Krypton Broad. of Birmingham, Inc.*, 106 F.3d 284, 289 (9th Cir. 1997) (holding willful infringement satisfies the purposeful availment requirement where defendant knows the owner's principal place of business), *rev'd on other grounds by Feltner v. Columbia Pictures Television*, 532 U.S. 340 (1998).

Moreover, this Court has a vital interest in adjudicating this matter given that, within only the past eleven days, two courts within this district entered consent orders that Defendants are now deliberately flouting.  *See supra*, at 5.  Courts have recognized that "New York has a substantial interest in protecting the intellectual property rights of copyright and trademark holders."  *M. Shanken Commc'ns, Inc. v. Cigar500.com*, No. 07 Civ. 7371, 2008 WL 2696168, at *9 (S.D.N.Y. July 7, 2008).  Finally, and significantly, Plaintiffs have an overwhelmingly

compelling interest in obtaining meaningful and effective relief, particularly in light of Defendants' contemptuous efforts to thwart Plaintiffs' long-sought resolution with the true Grooveshark's prior owners.

## VII.   Service of Process by Email is Warranted in This Case.

Plaintiffs request permission to serve Defendants by electronic mail.  Defendants are operating their Counterfeit Service entirely online and communicate with the public entirely by electronic means.  With their Internet-only presence and their use of aliases in their communications, Defendants are able to conceal their true identities and addresses.  McDevitt Decl. ¶¶ 10-11,16, 22.  It would thus be impossible to serve Defendants unless the Court were to grant Plaintiffs permission to serve Defendants with process via electronic mail.  *Id.*

Under Rule 4(f)(3) of the Federal Rules of Civil Procedure, this Court has the power to authorize service of process on an individual in a foreign country by email as long as such service is not prohibited by international agreement with the country where Defendants are to be served.  *See Rio Properties, Inc. v. Rio Int'l Interlink*, 284 F.3d 1007, 1014 (9th Cir. 2002). Service of process by email is not prohibited here.[13]  Rule 4 does not require that a party first attempt service of process by those methods enumerated in Rule 4(f)(2), including by diplomatic channels, before petitioning the Court for alternative relief under Rule 4(f)(3).  *Rio Properties*, 284 F.3d at 1015.

The alternate method of service of process must also comport with due process.  *Rio*

---

[13] Ordinarily the Hague Convention would apply to service on defendants located in The Ukraine, which, along with the United States, is a signatory to the Hague Convention on the Service Abroad of Judicial and Extra-Judicial Documents in Civil and Commercial Matters.  Although service by email is not one of the means explicitly provided for by the Hague Convention, the Hague Convention, by its own terms, does not apply where the address of the person to be served with the document is not known, as is the case here.  *See* Hague Convention on the Service Abroad of Judicial and Extra-Judicial Documents in Civil and Commercial Matters, Nov. 15, 1965, [1969] 20 U.S.T. 361, art. 1.  Thus, service by email is not prohibited.

*Properties*, 284 F.3d at 1016-17; *Phillip Morris USA Inc. v. Veles Ltd.*, No. 06 CV 2988, 2007 WL 725412 , at *5 (S.D.N.Y. Mar. 12, 2007).  Due process requires that any service of notice be "reasonably calculated, under all circumstances, to appraise interested parties of the pendency of the action and afford them an opportunity to present their objections."  *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950).  In similar cases, Courts have found that service by email is "constitutionally acceptable" to satisfy due process.  *See, e.g.*, *Rio Properties*, 284 F.3d at 1017; *Phillip Morris*, 2007 WL 725412, at *2-3.

This Court and others have often permitted service of process by email to online businesses, especially in situations where defendants are conducting illicit operations solely via the Internet while concealing their true physical addresses and identities.  *See, e.g.*, *True Religion* TRO at 12; *NFL* TRO at 10; *Fujian* TRO at 7; *Prediction Co. LLC v. Rajgarhia*, No. 09 Civ. 7459 (SAS), 2010 WL 1050307 (S.D.N.Y. Mar. 22, 2010); *Phillip Morris USA*, 2007 WL 725412, at *3; *Bank of Credit & Commerce Int'l (Overseas) Ltd. v. Tamraz,* No. 97 Civ. 4759 (SHS), 2006 WL 1643202 (S.D.N.Y. June 13, 2006); *Tishman v. The Associated Press*, No. 05 Civ. 4278, 2006 WL 288369 (S.D.N.Y. Feb. 6, 2006).  Indeed, there exists "a catalogue of cases where courts have granted leave for a plaintiff to serve by e-mail where . . . defendants conduct business extensively, if not exclusively, through their Internet websites and correspond regularly with customers via email"  *Chanel, Inc. v. acheterchanel.com*, No. 12-cv-21854, 2012 WL 3544844, at *2 (S.D. Fla. Aug. 16, 2012) (quoting *Philip Morris*, 2007 WL 725412, at *3).

Service by email would serve the interests of justice, as well as the principles of fairness. Accordingly, the Court should grant Plaintiffs leave to serve Defendants with the Summons and Complaint as well as this Court's Order and supporting documents via Defendants' email address.

## CONCLUSION

For the reasons stated above, Plaintiffs respectfully request that this Court grant their *ex parte* application for a TRO, seizure order, and order to show cause why a preliminary injunction should not issue. Plaintiffs further request that the Court permit notice of the preliminary injunction hearing and service of the Complaint by alternative means.


DATED:  New York, NY
            May 12, 2015

 

Respectfully submitted,

JENNER & BLOCK LLP


By: _____
     Andrew H. Bart (AB-6724)
     Gianni P. Servodidio (GS-0713)
     Lindsay W. Bowen (LB-8510)
     Alison I. Stein (AS-2884)
     Ava U. McAlpin (AM-4645)
     919 Third Avenue
     39th Floor
     New York, NY 10022
     Telephone:  (212) 891-1600
     Facsimile:   (212) 891-1699

     Kenneth L. Doroshow (KD-8374)
     1099 New York Ave., N.W.
     Suite 900
     Washington, DC 20001
     Telephone:  (202) 639-6027
     Facsimile:   (202) 639-6066

     *Attorneys for Plaintiffs*