# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

ARISTA RECORDS LLC, ATLANTIC
RECORDING CORPORATION, CAPITOL
RECORDS, LLC, ELEKTRA ENTERTAINMENT
GROUP INC., LAFACE RECORDS LLC, SONY
MUSIC ENTERTAINMENT, UMG RECORDINGS,
INC., WARNER BROS. RECORDS INC.,
WARNER MUSIC GROUP CORP., and
ZOMBA RECORDING LLC,

     *Plaintiffs*,

     v.

VITA TKACH and DOES 1-10, D/B/A
GROOVESHARK.IO and GROOVESHARK.PW,

     *Defendants*.

CIVIL ACTION NO. _____

**DECLARATION OF MARK MCDEVITT IN SUPPORT OF PLAINTIFFS' *EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER, SEIZURE ORDER, AND ORDER TO SHOW CAUSE FOR PRELIMINARY INJUNCTION**

**[FILED UNDER SEAL PURSUANT TO 15 USC § 1116]**

I, Mark McDevitt, declare as follows:

1.     I am Vice President, Online Anti-Piracy at the Recording Industry Association of America ("RIAA"). The RIAA is the trade association that supports and promotes the creative and financial vitality of the major recorded music companies. RIAA members, which include the Plaintiffs in this action, create, manufacture, and/or distribute roughly 85% of all legitimate recorded music produced and sold in the United States. I manage the day-to-day operations of the RIAA's online anti-piracy program. This program is focused on protecting the intellectual property of RIAA member companies, primarily through the use of notices to parties offering unauthorized copies of copyrighted sound recordings. In my capacity as Vice President, Online

Anti-Piracy at the RIAA, I work closely with anti-piracy personnel at our member record companies, including at all of the Plaintiffs in this action.

2.       I submit this declaration in support of Plaintiffs' Ex Parte Motion for a Temporary Restraining order against Defendants Vita Tkach, Does 1-10, d/b/a Grooveshark.io and Grooveshark.pw ("Defendants").   The statements made in this declaration are based on my personal knowledge or on my information and belief, as set forth below.  If called to testify as a witness, I would testify as follows:

**<u>The Grooveshark Service</u>**

3.       By virtue of my work at the RIAA, I am familiar with Escape Media Group, Inc. ("Escape").  Escape is the former owner and operator of the music streaming service known as "Grooveshark," previously available at the website www.grooveshark.com.  From 2008 until April 30, 2015, Escape offered visitors the ability to stream music directly from the Grooveshark website to their personal computers or other compatible devices.  The Grooveshark service was extremely popular, boasting as many as 35 million users at its peak.  For the vast majority of music that it provided through the Grooveshark service, however, Escape did not have licenses from copyright owners.

4.       Between January 2010 and August 2012, the Plaintiffs in the above-captioned suit filed three separate lawsuits against Escape in New York state and federal courts asserting a variety of claims relating to Escape's unauthorized reproduction, distribution, and public performance of Plaintiffs' copyrighted sound recordings via the Grooveshark service.  *UMG Recordings, Inc. Escape Media Group, Inc.*, No. 100152/10, Complaint (N.Y. Sup. Ct. Jan. 6, 2010); *Arista Music, et al. v. Escape Media Group, Inc.* ("*Arista Music*"), No. 11 Civ. 8407, Complaint, Dkt. No. 3 (S.D.N.Y. Dec. 18, 2011); *Capitol Records, LLC, d/b/a EMI Music North*

America ("*EMI*"),  No. 12-CV-6646 (AJN), Complaint, Dkt. No. 1 (S.D.N.Y. Aug. 30, 2012). On September 29, 2014 in the *Arista Music* case, and on March 15, 2015 in the *EMI* case, the Courts found Escape liable for copyright infringement via the Grooveshark service.

5.     On April 30, 2015, Escape ceased to operate the Grooveshark service.  On that same date, Escape and Plaintiffs submitted consent judgments in all three cases providing for permanent injunctive relief against Escape and, in two of the cases, awarding Plaintiffs monetary damages of $50 million dollars (in the *Arista Music* case) and $25 million dollars (in the *EMI* case).  The Courts entered all three judgments shortly thereafter.  *Arista Music*, No. 11 Civ. 8407 (TPG), Dkt. No. 175 (May 1, 2015); *UMG v. Escape*, No. 100152/10, Dkt. No. 269 (May 4, 2015); *EMI*, No. 12-CV-6646 (AJN), Dkt. No. 108 (May 5, 2015).

6.     Since the cessation of the Grooveshark service on April 30, 2015, the Grooveshark website consists of only a single webpage explaining that Escape has shut down the former Grooveshark service and has assigned all of its intellectual property rights to the Plaintiffs.  *See* www.grooveshark.com.

7.     Plaintiffs' actions against Escape and the cessation of the Grooveshark service have received widespread media coverage in prominent news outlets including the New York *Times*, the Washington *Post*, and the Los Angeles *Times*.  True and correct copies of examples of such coverage are attached at Exhibit A hereto.

**Defendants' Bad Faith Registration of the Grooveshark.io Domain Name**

8.     In the course of my duties for the RIAA, I am familiar with the role that domain names play in the architecture of the Internet, as well as the manner in which domain names are registered and transferred.

9.      On or about May 2, 2015, two days after the shutdown of the Grooveshark service, Defendants registered the domain names "grooveshark.io" and "grooveshark.pw."  The ".io" domain is the country code top-level domain reserved for the British Indian Ocean Territory, and the ".pw" domain is the country code top-level domain reserved for the Republic of Palau.  It is not necessary for a website operator to have any association with the British Indian Ocean Territory or the Republic of Palau in order to acquire and use a ".io" or ".pw" domain name.[1]

10.      The registration record for the "grooveshark.io" domain name lists an individual named "Vita Tkach" as the Domain Owner, Admin Contact, Technical Contact, and Billing Contact with an address in the city of Vinnytsia in Ukraine.  The registration records for both grooveshark.io and grooveshark.pw also indicate that Defendants registered the "grooveshark.io" and "grooveshark.pw" domain names through the services of Namecheap, Inc., a domain name registrar based in Los Angeles, California, although the registrant of the "grooveshark.pw" domain name is in the name of "WhoisGuard, Inc.," an identity protection service based in Panama.  True and correct copies of the registration records for the "grooveshark.io" and "grooveshark.pw" domain names are attached hereto as Exhibit B.

11.      In my experience, it is common for pirate website operators to supply false information to the domain name registrar when securing a domain name in order to conceal their true identities.  In this case, and based on my experience with online antipiracy investigations generally, it is likely that Vita Tkach is an alias.

---

[1] According to Nic.io, the service that administers the .io top-level domain registry, "[a]n applicant [for a domain name within the .io domain] may reside in any legal jurisdiction" (www.nic.io/rules.html).

12.     On May 5, 2015, Defendants launched a new website, grooveshark.io, using the same or very similar domain names, trademarks, and logo designs as Escape's Grooveshark service.  Shortly thereafter, Defendants also implemented a web address, grooveshark.pw, which automatically redirects Internet traffic to the Grooveshark.io website.

13.     The Grooveshark.io website is blatantly illegal, offering unlicensed streams and downloads of thousands of the world's most popular copyrighted sound recordings, including sound recordings owned or controlled by Plaintiffs.  A true and correct copy of the home page for the Grooveshark.io website is attached hereto as Exhibit C.

14.     In an attempt to draw attention to their new website, Defendants have contacted various U.S.-based news outlets using the aliases "New Grooveshark" and "Shark" and claimed that the Grooveshark.io website was a resurrection of the old Grooveshark service.  In various articles, the operators of the Grooveshark.io website admitted their bad faith and unlawful intentions, claiming that they copied the Grooveshark website "Because **YES, we can**.  And we want to.  Simple as that."  *See* Exhibit D hereto, which is a true and correct copy of an article from Gizmodo.com (Mario Aguilar, <u>Grooveshark Defiantly Resurrected By a Rogue Pirate</u>, Gizmodo.com (May 5, 2015, 5:35 PM)).  Acknowledging the illegality of their conduct and the likelihood of copyright enforcement efforts against them, Defendants asserted that "[i]t's going to be a roller coaster, and we're ready for it."  *See* Exhibit E hereto, which is a true and correct copy of an article from BGR.com (Jacob Siegal, <u>Days after its demise, Grooveshark is back</u>, BGR.com (May 5, 2015, 11:54 AM)).

15.     Despite Defendants' claim to have resurrected the old Grooveshark service, it is more likely that the Grooveshark.io website is merely a rebranding of an already-existing pirate music site, which Defendants are seeking to promote through the unauthorized use of the

"Grooveshark" name, trademarks, and logos.  As one media outlet observed, "[t]he [Grooveshark.io] site appears to be a rebranding of mp3juices.se, another music piracy site. . . suggesting that Shark may instead be using the Grooveshark name to bring attention to mp3juices."  *See* Exhibit F hereto, which is a true and correct copy of an article from theVerge.com (Jacob Kastrenakes, <u>A new Grooveshark is online and streaming music</u>, theVerge.com (May 5, 2015, 4:46 pm)).  Nevertheless, Defendants claim to have copied "90%" of the contents of the Grooveshark service in anticipation of the shutdown of the service following the Courts' entry of summary judgment against Escape in the actions noted above.  *See* Exhibit G hereto, which is a true and correct copy of an article from TechRadar.com (Michelle Fitzsimmons, <u>Grooveshark clone still swimming, will be "better and stronger than it ever was</u>," TechRadar.com (May 7, 2015)).

**<u>Defendants' Efforts to Evade Copyright Enforcement in the United States</u>**

16.    Defendants employ the services of an Internet Service Provider called "CloudFlare" in connection with certain aspects of the Grooveshark.io website.  CloudFlare provides a so-called "pass-through security service" that acts, in effect, as a "middleman" that sits between a website and the users who interact with it.  Rather than allow users to contact the server on which the website is hosted directly, CloudFlare receives certain user interactions with the Grooveshark.io website and relays them through CloudFlare servers to the hosting provider. Because of the presence of CloudFlare's servers, it is impossible to identify the location of the actual server supporting those aspects of the website absent the disclosure of this information by CloudFlare (or by Defendants themselves).

17.    Defendants employ CloudFlare for all aspects of the Grooveshark.io website except for the distribution of digital music files, which Defendants host on a server with the

domain name "dl.grooveshark.io" (the "Download Server").  When Defendants launched the

Grooveshark.io website on May 5, 2015, the Download Server was hosted by Nodisto IT, LLC, a

website hosting service provider with addresses in Las Vegas, Nevada and Dallas, Texas.[2]

18.     On or about May 5, 2015, the RIAA submitted a copyright complaint notice to

CloudFlare regarding its role in the operation of the Grooveshark.io website.  In response to this

notice, CloudFlare informed the RIAA that it had notified the operator of the Grooveshark.io

website of the RIAA's complaint, but did not discontinue providing its services to the website.

In addition, CloudFlare confirmed that the hosting provider for the Grooveshark.io website was

Nodisto IT, LLC, and stated that it had also notified Nodisto of the RIAA's complaint.  A true

and correct copy of CloudFlare's response is annexed hereto as Exhibit H.

19.     Immediately following being notified of the RIAA's complaint by CloudFlare,

Defendants moved the Grooveshark.io website to a new hosting provider that was located

outside the United States.  As of May 6, 2015, Defendants had secured a new IP address for the

Download Server (37.48.71.20).  According to Réseaux IP Européens ("RIPE," the European

counterpart to ARIN), this address is in a block of IP addresses assigned to an Internet hosting

provider called "LeaseWeb" with a business address in Amsterdam, The Netherlands.[3]  Based on

my use of a standard Internet investigatory tool known as "Traceroute," it appears the Download

Server is physically situated in The Netherlands.  Based on my experience, I consider it likely

---

[2] On May 5, the domain name of the Download Server pointed to the Internet Protocol ("IP")
address 63.142.250.15.  According to the American Registry for Internet Numbers ("ARIN"),
this IP address is in a block of IP addresses assigned to Nodisto.

[3] https://apps.db.ripe.net/search/query.html?searchtext=37.48.71.20#resultsAnchor

that Defendants have moved the entire site to LeaseWeb, including the portion for which the hosting provider is obscured from public view by CloudFlare.[4]

20.     LeaseWeb has a long history of hosting major pirate sites.  For example, LeaseWeb once hosted the notorious (and now shuttered) pirate website "MegaUpload," which was the subject of the largest criminal copyright law enforcement action ever undertaken. Similarly, LeaseWeb has been a defendant in litigation in The Netherlands brought by BREIN, the leading Dutch antipiracy agency, in order to obtain disclosure of the identities of its customers that operated pirate sites.  In a case that is well-known in the antipiracy community regarding the prominent pirate site "Everlasting.nu," LeaseWeb refused to terminate hosting for the site or to disclose contact information regarding the website operator.[5]  Other examples of LeaseWeb's involvement with pirate sites are also well known in the antipiracy community.

**<u>Curative Steps to Prevent Transfer of the Domain Name</u>**

21.     The most direct means of stopping Defendants from their illegal behavior would be to require the hosting provider (LeaseWeb) to sever communication to or from the Grooveshark.io website.  Because LeaseWeb is located outside of the United States, however, I understand that this Court may not be able to compel such relief.

22.     As noted above, Defendants have registered the grooveshark.io domain name with the U.S.-based domain name registrar Namecheap, located in California.  As the registrar for domain name, Namecheap has the technical capability to prevent Defendants from transferring

---

[4] Although the Grooveshark.io website has been in existence for only a matter of days, the Grooveshark.io operator known only as "Shark" has reportedly informed media outlets that Defendants already "had to move hosting companies four times."  *See* Exhibit G.

[5] *See* Diederik E. Stols,  <u>Potential Liability of Internet Hosting Provider for Hosted Content Reconfirmed</u>, International Law Office Newsletter, Sept. 11, 2008, *available at* <u>http://www.internationallawoffice.com/newsletters/detail.aspx?g=c5012adf-9275-4979-817b-7867b886f5a2</u>, attached hereto as Exhibit I.

the registration for the domain name to another registrar by placing a "lock" on the domain name during the pendency of the case.  If the Court were to order Namecheap to implement such a "lock," it would prevent Defendants from transferring the domain name registration to a registrar outside of the United States during the pendency of this action, or for so long as the Court otherwise directs.  Similarly, a lock on the domain name can prevent Defendants from attempting to transfer ownership of the domain to any third party.

23.     Namecheap also has the technical capability to prevent Defendants from continuing to use the Grooveshark.io and Grooveshark.pw domain names to direct Internet traffic to their illegal website.  A domain registration record lists authoritative "nameservers" associated with the domain.  In the normal course, the domain registrant selects the nameservers to be used with a domain and then creates records with those nameservers to indicate the IP addresses that should correspond to names such as grooveshark.io and dl.grooveshark.io.  The nameservers are often operated by third parties unaffiliated with the registrant or the registrar. Namecheap can readily change the authoritative nameservers for the grooveshark.io and grooveshark.pw domains to servers controlled by Plaintiffs (or any other third party selected by the Court) to hold in escrow pending further direction from the Court, and to change the nameserver records to list different (or no) IP addresses for the grooveshark.io and grooveshark.pw domains, the effect of which would be to disable access to the Grooveshark.io website during this period.

24.     An order from this Court compelling Namecheap to change the authoritative nameservers and nameserver records in this manner would provide meaningful relief from Defendants' ongoing and brazen infringement of Plaintiffs' intellectual property.  To the best of

my knowledge, Plaintiffs have not publicized that they are seeking the requested relief in this case.

**Advance Notice To Defendants Would Frustrate Plaintiffs' Enforcement Efforts**

25.     If Defendants were to receive notice of this action, they would be highly likely to take all available steps to transfer the registration of the Grooveshark.io domain name from this U.S.-based registrar to any one of hundreds of domain name registrars located outside the United States.

26.     If successful, such a transfer of the domain names' registration would directly frustrate Plaintiffs' efforts to prevent the ongoing use of the grooveshark.io and grooveshark.pw domain names for the illegal Grooveshark.io service.  Indeed, given that Defendants have already moved their website from a U.S.-based hosting facility to a hosting facility in the Netherlands in response to the RIAA's copyright complaint, and in light of Defendants' public boasts of their illegal activities, it is virtually certain that notice of this action would result in Defendants' immediate efforts to move the grooveshark.io and grooveshark.pw domain registrations to a foreign entity, beyond the reach of enforcement in the United States.  As Defendants themselves have proclaimed, "[w]e have all the servers/domains infrastructure in place, it's going to be a roller coaster and we're ready for it."  *See* Exhibit E.

**Identification of Copyrighted Works-in-Suit**

27.     On May 6 and 7, 2015, a long-standing RIAA contractor conducted searches on the Grooveshark.io website for sound recordings corresponding to the names of Plaintiffs' copyrighted works and downloaded copies of the associated music files (in "MP3" format) from Grooveshark.io to computers located in New York.  I was provided with access to these files.  A list of the works here at issue (the "Works in-Suit"), is attached to the Complaint filed herewith.

28.     To verify that each of these files consisted of a sound recording for which one of the Plaintiffs holds exclusive rights, I directed RIAA personnel to use an automated "content recognition" service, operated by the industry-leading company Audible Magic, to identify the work contained in each music file.  This content recognition service is based on recognizing the underlying audio work no matter how the file containing the content was created (for example, ripped from a CD or copied from an Internet file-sharing network).  The Audible Magic system creates a "psychoacoustic" fingerprint of musical content, meaning that the Audible Magic fingerprint is a mathematical representation of the way the underlying audio content sounds to the human ear. *See* http://audiblemagic.com/technology.php.

29.     Each Work-in-Suit listed in Exhibit J hereto (and each work in the Work-in-Suit list attached to the Complaint )was matched in the Global Rights Registry Database as a copyrighted work owned by the respective Plaintiffs in this action.


I declare under penalty of perjury that the foregoing is true and correct.

Executed this 1th day of _May_ , 2015 at Washington, D.C.

_____

Mark McDevitt