# Exhibit A

1

F5Q8ARIC

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    ARISTA RECORDS LLC, et al.,

4                    Plaintiffs,

5           v.                            15 Cv. 3701 (AJN)

6    VITA TKACH, et al.

7                    Defendants.

8    ------------------------------x

9                                    May 26, 2015
                                     12:00 p.m.
10
     Before:
11
                     HON. ALISON J. NATHAN
12
                                         District Judge
13
                          APPEARANCES
14
     JENNER & BLOCK LLP
15        Attorneys for Plaintiffs
     BY:  KENNETH L. DOROSHOW
16        GIANNI P. SERVODIDIO

17   GOODWIN PROCTER
          Attorneys for Defendant
18   BY:  WILLIAM J. HARRINGTON

19

20   Also present:  (by telephone)

21        KENNETH CARTER, CloudFlare, Inc.
          MITCHELL STOLTZ, Electronic Frontier Foundation
22        CORYNNE McSHERRY, Electronic Frontier Foundation

23

24

25

                     SOUTHERN DISTRICT REPORTERS, P.C.

2

F5Q8ARIC

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.

3

F5Q8ARIC

1           (Case called)

2           THE DEPUTY CLERK:  Parties, please state your name for

3     the record starting with the plaintiff.

4           MR. DOROSHOW:  Good morning, your Honor.  Kenneth

5     Doroshow for the plaintiffs.

6           THE COURT:  Good morning, Mr. Doroshow.

7           MR. SERVODIDIO:  Gianni Servodidio for the plaintiffs.

8           THE COURT:  Good morning, Mr. Servodidio.

9           For the defendant, present in the courtroom, for

10    CloudFlare.

11          MR. HARRINGTON:  Bill Harrington.

12          I can tell the Court that telephonically are my

13    co-counsel Mitchell Stoltz and Corynne McSherry for Electronic

14    Frontier Foundation, and counsel for CloudFlare, Kenneth

15    Carter.

16          THE COURT:  The folks on the phone, we have got Mr.

17    Carter, Mr. Stoltz and Ms. McSherry.  Are you able to hear me?

18          COUNSEL IN UNISON:  Yes, your Honor.

19          THE COURT:  The acoustics for joining a hearing by

20    phone are not good, I am afraid, but I am happy to have you

21    listen in.  I suspect you won't have difficulty hearing me.

22    You may have difficulty hearing counsel.  I have got the

23    speaker pointed at the phone the best I can.  I will ask

24    counsel to please speak directly into the microphone and keep

25    your voices up.  We do have a court reporter.  So to the extent

SOUTHERN DISTRICT REPORTERS, P.C.

4

F5Q8ARIC

1    that you miss anything, I urge you to order the transcript to

2    cover it.

3           With those introductions, we are here on plaintiffs'

4    application for a supplemental order and order to show cause

5    requiring third-party CloudFlare, Inc. to comply with the

6    pending temporary restraining order.

7           Just to get the procedural posture clarified, I will

8    indicate I am on Part 1 duty so I have had TROs coming out of

9    my eyeballs, and so I have not, though this came in on the

10   Friday before the long weekend, and I just moments before

11   coming on the bench was handed a copy of CloudFlare's

12   opposition letter, needless to say, this is new to me, and so

13   we will figure out what we need to do today, what we might need

14   to do over a longer period of time, but let's just get the

15   procedural posture squared away.

16         This case, which is 15 Civ. 3701, came in a few weeks

17   ago as a related case to a case in front of me.  Because it had

18   not yet been assigned a judge when it came in, the temporary

19   restraining order request that came with the complaint went to

20   the then Part 1 judge, Judge Batts.  She granted the TRO, which

21   I have in front of me, and I am sure there is a docket number

22   for it, but I don't have it in front of me.  It should have

23   been docketed.  The case was filed under seal.  I have, I

24   believe, unsealed the case, seeking verification from my clerk.

25   Yes.  In any event, Judge Batts granted this TRO against the

5

F5Q8ARIC

1    defendants, and that was on -- was that May 13, counsel?

2              MR. SERVODIDIO:  Yes, your Honor.

3              THE COURT:  -- May 13, 2015 against the defendants.  I

4    think for present purposes, it contains a provision -- we will

5    get to the argument for application to the third party here.

6              Who should I hear from on behalf of the plaintiffs,

7    Mr. Doroshow?

8              MR. DOROSHOW:  Yes, your Honor.

9              THE COURT:  So, you then did what with the TRO with

10   respect to CloudFlare?

11             MR. DOROSHOW:  Before we got to CloudFlare, the TRO

12   spoke specifically to the domain name registrar through which

13   the defendants had registered their then current domain names,

14   and that was a company called Namecheap.  So we went

15   immediately to Namecheap with the TRO, which required them to

16   take certain action with respect to the domain name, to

17   effectively renter it inaccessible, which they did.  We also

18   immediately served it on defendants who have since openly filed

19   the order.

20             The very next day the defendants changed their domain

21   name to yet another iteration of a Grooveshark domain from what

22   was grooveshark.io and grooveshark.pw to a domain called

23   grooveshark.vc.  So we then went to the domain registrar who

24   administers that domain, and they too complied, the effect of

25   which was to render that domain inaccessible.

SOUTHERN DISTRICT REPORTERS, P.C.

6

F5Q8ARIC

1          At the same time we went to that particular domain

2     registrar, we went to CloudFlare with a copy of the order.

3          THE COURT:  When was that?

4          MR. DOROSHOW:  That was on the 14th of May, the day

5     after the TRO issued.

6          THE COURT:  Go ahead.

7          MR. DOROSHOW:  Then CloudFlare's in-house counsel

8     responded, invited a telephone conversation, which we had on

9     the 15th.  The sum and substance of that conversation was that

10    CloudFlare did not believe the order applied to them, and that

11    if we wanted them to take any action with respect to this

12    particular Web site, that we would have to seek an order from

13    your Honor to do so, which is where we are now.

14         THE COURT:  Then Mr. Servodidio was here on Friday,

15    which was May 22, with the papers seeking this supplemental

16    order.  I briefly met with him just to indicate that there was

17    no basis for proceeding ex parte.  He indicated that in fact

18    the papers had been served on CloudFlare.  We set a 5:00 time

19    for a potential remeeting for the plaintiff to be heard.  I

20    learned that that time was unavailable, I believe that time was

21    unavailable for CloudFlare, so you worked out a time over the

22    weekend, and that's why we are here now.

23         So I think procedurally that's as far as we got, until

24    a short time ago, Mr. Harrington, you filed on behalf of

25    CloudFlare an opposition paper.

SOUTHERN DISTRICT REPORTERS, P.C.

7

F5Q8ARIC

1          MR. HARRINGTON:  Yes, your Honor.  I apologize both to

2     plaintiffs and the Court for submitting it so close to our

3     12:00.

4          The request that we have is that we have until Monday,

5     June 1, to file briefing in connection with this.  The purpose

6     of the letter was to give the Court some of the reasons why we

7     think that this is a serious issue and a challenging issue for

8     CloudFlare, an important issue for servicers that operate in

9     the Internet, and why an expansion of a TRO like this, two

10    entities beyond an entity such as a domain registrar, poses

11    serious problems, novel problems, and we would like adequate

12    time to be able to brief it and fully develop arguments related

13    to that.

14         THE COURT:  Well, I will hear from plaintiff on that.

15    I think what we need to do, I am inclined certainly to give

16    CloudFlare an opportunity to be more fully heard, and in any

17    event, I need time to read what they have to say.  I think a

18    couple of procedural questions come to mind, and then maybe

19    related, some factual questions.

20         In the underlying case, we have a preliminary

21    injunction hearing set for June 3rd.  I believe that there has

22    been no appearance or opposition by the actual defendants in

23    that case.  And plaintiffs' counsel are shaking their head yes.

24         So, on the theory that that continues to be so,

25    presumably we will be in something like a default judgment

SOUTHERN DISTRICT REPORTERS, P.C.

8

F5Q8ARIC

1    posture and plaintiff will be seeking to have the TRO converted

2    to a PI, or permanent injunction.

3              MR. DOROSHOW:  That's correct.

4              THE COURT:  Let me begin there and ask plaintiffs'

5    counsel, has there been any indication that any of the named

6    defendants in 15 Cv. 3701 are intending to participate?

7              MR. DOROSHOW:  Quite to the contrary, your Honor.  The

8    people or persons who are responsible for this Web site have

9    openly announced through media channels that they are in

10   defiance of the order, and that we can't to anything to stop

11   them.  So they are not going to appear, as far as we can tell.

12             THE COURT:  OK.  I suppose this is a factual question

13   for both sides, depending on whether you agree or not.

14             What then now is happening with grooveshark.io, dot

15   pw, dot vc, or dot anything else?  In other words, what is out

16   in the Internet world with respect to what you argue is the

17   infringing site?

18             MR. DOROSHOW:  Just to follow the timeline, as I

19   indicated previously, after they had moved the Web site from

20   grooveshark.io and grooveshark.pw to a new domain

21   grooveshark.vc, we had proceeded with the registrar to

22   effectively shut down grooveshark.vc.  Immediately thereafter,

23   the same defendants had registered for yet another domain name

24   grooveshark.li, which happens to be the top-level domain for

25   the nation of Liechtenstein, and it is administered in

                 SOUTHERN DISTRICT REPORTERS, P.C.

F5Q8ARIC

1    Switzerland.  So they are now operating as grooveshark.li.

2         Now, throughout the entire process, from the beginning

3    of grooveshark.io all the way through to the present

4    grooveshark.li, CloudFlare has been servicing this Web site,

5    and that is why we are here to seek a remedy against

6    CloudFlare.

7         THE COURT:  We will get briefly to what it means for

8    CloudFlare to service the Web site, and I have come to the

9    awareness that there may be factual questions that implicate

10   legal issues here, but this is just to get my head around the

11   basics of the technology.

12        So, it's plaintiffs' position that as this sort of

13   game of Whac-A-Mole continues, that wherever grooveshark dot

14   whatever is next, assuming you can get LI shut down, the Web

15   site itself, once it appears through a domain registrar, is

16   serviced by CloudFlare, and I understand from the letter what

17   that means I think.

18        Well, let me ask plaintiff first and then defendant

19   very briefly what you understand that to mean and what would

20   happen if CloudFlare did stop servicing.

21        MR. DOROSHOW:  Sure.

22        You're correct that the Web site is up and running in

23   whatever iteration.  Today's iteration is grooveshark.li.  It

24   is growing in popularity.  It is becoming more of a problem

25   every day.  The irreparable harm of which we complained at the

F5Q8ARIC

1    very beginning of this process only continues to worsen.

2         With respect to what CloudFlare is doing, I must say

3    for the record we were handed a copy of the letter that

4    CloudFlare provided to you, although with the caveat that it is

5    not the same letter that your Honor has.  We were handed an

6    earlier version, so we have yet to see the version your Honor

7    has.  We have to reserve rights to whatever that letter

8    contains.  But having quickly reviewed, sitting here today, the

9    letter, the version that was handed to us, there are some

10   pretty fundamental inaccuracies in the letter.  But even a

11   basic point of agreement, there is a statement in the letter

12   which says that among the services that CloudFlare provides is

13   to ensure that Web surfers get the fastest page load times and

14   best performance.

15        Among the services that CloudFlare provides to its Web

16   site customers is optimization and speed.  So it enhances the

17   user experience.  So through CloudFlare services, people are

18   using this blatantly infringing Web site.  Its mere existence

19   is infringing and its express purpose is infringing.  Users get

20   an enhanced experience by virtue of CloudFlare services.

21   That's at a baseline level.

22        More under the hood, the technical services that they

23   provide include, without limitation, the name server resolution

24   to the Web site.  And what that means is, whenever a user

25   enters a domain name into his or her browser, Amazon.com for

SOUTHERN DISTRICT REPORTERS, P.C.

11

F5Q8ARIC

1    example, that domain name has to be resolved to an IP address,

2    because computers only speak to each other in terms of

3    numerical addresses.  So there is this domain name system that

4    will resolve the human readable name of, in this instance

5    grooveshark.li, to a numerical IP address.

6         There are what are called authoritative name servers

7    for every domain.  And that authoritative name server has the

8    definitive conversion information.  In other words, there is an

9    authoritative name server that is queried.  Essentially, the

10   computer asks that server, What is the IP address for

11   grooveshark.li?  It says it's this number, sends that number

12   back to the computer, and the computer then accesses the Web

13   site through the IP address.

14        CloudFlare is providing that name server

15   functionality.  In fact, the current name of the grooveshark.li

16   name servers, and there are two, which typically it's done for

17   redundancy purposes, one is called jim.ns.cloudflare and the

18   other is called olga.ns.cloudflare, the NS standing for name

19   server.

20        So CloudFlare is providing that name server domain a

21   numerical address resolution.  If they were to stop doing that,

22   a query to the Web site for grooveshark.li would not return a

23   response, and the user therefore could not access

24   grooveshark.li through that domain name.  And that's the remedy

25   we are seeking from CloudFlare here.

SOUTHERN DISTRICT REPORTERS, P.C.

F5Q8ARIC

1           THE COURT:  So it follows then that the answer to the

2      second question, if CloudFlare were to stop servicing

3      grooveshark.li or whatever is next, that there would be no

4      ability -- you tell me.  What then?

5           MR. DOROSHOW:  Then the operators would have to

6      reconfigure their system in some way, and theoretically they

7      could.  But CloudFlare should not be permitted to provide not

8      only the name server resolution, but the optimization services

9      that it also provides that speed up the user experience.

10          THE COURT:  So just to get my head around what is

11     going to happen between now and when this is resolved or what

12     is not going to happen between now and when this is resolved.

13          So, on the optimization or the enhancement, presumably

14     grooveshark dot whatever continues to exist in the world and be

15     accessible, but it will be a slow go for viewers as a result of

16     the lack of servicing by CloudFlare.  That's one thing that

17     will happen or not happen.

18          MR. DOROSHOW:  Correct.

19          THE COURT:  I couldn't quite tell if the other thing

20     that you're saying was happening is, not only will it not be an

21     enhanced experience, there will be no experience.

22          MR. DOROSHOW:  That's correct.  In addition to the

23     optimization services, if they stop providing the name server

24     functionality, if they stopped providing these Jim and

25     olga.ns.cloudflare name servers, a query for grooveshark.li

SOUTHERN DISTRICT REPORTERS, P.C.

13

F5Q8ARIC

1   will return no result, and therefore a user will not be able to

2   access the Web site on that basis.

3         THE COURT:  How do people know about grooveshark.li or

4   dot whatever else?

5         MR. DOROSHOW:  In terms of just the general awareness

6   of the site's existence?

7         THE COURT:  Yes.

8         MR. DOROSHOW:  Through the promotion that these

9   anonymous operators using aliases, including shark, that's a

10   common alias that this particular defendant is using, makes

11   statements to the press and there tends to be a bit of a

12   groundswell from there.

13         Basically, what the defendants are trying to do is to

14   exploit the attention and gather eyeballs for their Web sites

15   through word of mouth.  And their open defiance of this Court's

16   order is presumably regarded as a marketing tool.

17         THE COURT:  So if that happens and there is a news

18   article that says now they are grooveshark.li, and someone

19   wants to go download music through grooveshark.li, does the

20   name server functionality that you talked about that involves

21   CloudFlare have anything to do with that or will they still be

22   able to go to grooveshark.li?

23         MR. DOROSHOW:  It has everything to do with it.  That

24   is what is happening today.  The Web site is currently at

25   grooveshark.li.  The defendants have promoted it in that

SOUTHERN DISTRICT REPORTERS, P.C.

14

F5Q8ARIC

1    fashion.  So that's the current state of the universe.  Any
2    time a user wants to go to grooveshark.li by entering that
3    address in their browser, there is this name server resolution
4    that occurs on a CloudFlare server.  Without that server and
5    without functionality, a query --
6              THE COURT:  You would get a blank page.
7              MR. DOROSHOW:  Correct.
8              THE COURT:  You said Lithuania, is that where
9    grooveshark.li is?
10             MR. DOROSHOW:  Liechtenstein.
11             THE COURT:  So if that ends up shut down through
12   whatever mechanism, and then the defendants move to grooveshark
13   dot something else, so let's say it's grooveshark.co, and if
14   someone then types in grooveshark.co, does their ability to
15   access the Web site depend on whether CloudFlare is servicing
16   them or not?
17             MR. DOROSHOW:  It depends on whether there is a name
18   server that is set up.  If CloudFlare is providing that name
19   server, then CloudFlare will be assisting in that transmission.
20   If they go to some other party for a name server, then they
21   would access it through that other party.
22             THE COURT:  So the name server functionality is a
23   necessary component of accessing what you view as the
24   infringing Web sites.  So right now that's being provided by
25   CloudFlare.  If it's not CloudFlare, it could either be another

SOUTHERN DISTRICT REPORTERS, P.C.

F5Q8ARIC

 1    service or presumably maybe the defendants could do it

 2    themselves in some way.

 3            MR. DOROSHOW:  Theoretically.  It's typically an

 4    outsourced function to some third party, but yes.

 5            THE COURT:  So, the optimization and enhancement issue

 6    seems not to matter much.  Either it's on or it's off, right?

 7    Either you have access or you don't.  If you have access, then

 8    it's enhanced.  If you don't have access, it's certainly

 9    unenhanced.

10            So let me give Mr. Harrington an opportunity to

11    respond to any points they are raising.  Again, the idea here

12    is to help me get my head around the basic mechanics of what is

13    going on.  The goal here is to set a schedule of some kind and

14    figure out what we need to do in terms of additional briefing,

15    in terms potentially if there are factual issues, in resolving

16    these and the like.

17            Mr. Harrington, with the goal toward helping me

18    understand the basics, you have a different view as to what

19    CloudFlare's role is here?

20            MR. HARRINGTON:  Yes, your Honor.  Our view is that if

21    CloudFlare stops serving the customer, that customer may

22    automatically continue being able to provide services or can

23    very quickly and easily continue providing access to its

24    content.  So that enjoining CloudFlare from serving a

25    particular customer will not achieve the end, or if it does, it

16

F5Q8ARIC

1    will be for a very brief period of time.

2          THE COURT:  Because they would just hire somebody else

3    to do it or what?

4          MR. HARRINGTON:  We have a paragraph in our letter

5    that describes it.  It's at the top of page 2.  What we say in

6    the letter -- this is based on running the CloudFlare service

7    against what engineers at CloudFlare tell us -- is that should

8    CloudFlare cease to serve a customer, either traffic to the

9    customer's Web site will automatically be routed to the

10   customer's own servers rather than CloudFlare, just simply

11   bypassing the CloudFlare network, or the customer will detect a

12   loss of service and reconfigure its DNS throughout traffic

13   directly to customer services or to an alternate content

14   delivery network.

15         I think on this factual point, it's CloudFlare's view

16   now that enjoining CloudFlare will not achieve the goals that

17   plaintiffs seek.

18         THE COURT:  I am just trying to reread that sentence.

19         One possibility is, if CloudFlare enables access to

20   this allegedly infringing site, if what you're saying is if you

21   stop CloudFlare from doing that someone else will do it,

22   therefore don't stop CloudFlare from doing it, that doesn't get

23   you very far, as I am sure you recognize.

24         MR. HARRINGTON:  I don't think it's a kind of

25   Whac-A-Mole problem you have with the DNS registries where they

SOUTHERN DISTRICT REPORTERS, P.C.

F5Q8ARIC

1   are shut down and you can start it up somewhere else.  I think

2   this is more that a middleman is no longer in the middle.  So

3   the communications might just be going directly.  It might use

4   some other middleman.  But we are providing the services on the

5   Internet in a different way, and expanding the TRO to other

6   service providers like CloudFlare is an expansion of the kind

7   of attempts that plaintiffs, like the plaintiffs here, have

8   made to prevent infringers, and that raises difficult issues

9   and important issues that we want to address with the Court.

10          I suppose there are two points that I am making.  One

11  is we provide a different service than is typically the kind of

12  service that gets enjoined, or the kind of entity that gets

13  enjoined in these matters, and that we think is a reason why we

14  can't be enjoined.

15          THE COURT:  How long has CloudFlare been around?

16          MR. HARRINGTON:  I am not sure how many years

17  CloudFlare has been around.

18          THE COURT:  Do you know if they have ever been

19  enjoined related to copyright infringement?

20          MR. HARRINGTON:  It's my understanding, and we can

21  confirm this, in the past, when these issues have come up and

22  CloudFlare counsel has explained them, there wasn't

23  follow-through.  Basically, the parties accepted CloudFlare's

24  explanations and sought other avenues for remedy.  But I have

25  not represented CloudFlare previously in these kinds of

18

F5Q8ARIC

1    matters.

2          THE COURT:  You're not contesting any of the

3    underlying matters with respect to whether there is an

4    infringement of any kind going on here.  It's simply the nature

5    of the service you provide, if I am understanding your

6    contention, is sort of a middleman passivity that you

7    believe -- well, go ahead.

8          MR. HARRINGTON:  That's correct.  We are not here to

9    defend the defendants.  We are here to say that the service

10   that CloudFlare provides sits at a different point in the

11   Internet infrastructure, and enjoining entities like CloudFlare

12   is a novel step and one that we think raises important issues

13   that need to be fully briefed and explored by the Court before

14   the Court takes any actions.  It's our view now that CloudFlare

15   is not properly enjoined in connection with the activities of

16   these defendants because of the kind of service that it

17   provides.

18          It's the argument that we briefly sketch out in our

19   letter, which is that plaintiffs are treating the TRO as

20   something that can effectively enjoin the world.  Anyone who

21   touches upon the matters, no matter how passively, could be

22   enjoined.  Because if you remove them, it makes it a little

23   harder or maybe delays what the defendants are doing.

24          THE COURT:  Go ahead.

25          MR. DOROSHOW:  A few comments in response to that.

SOUTHERN DISTRICT REPORTERS, P.C.

F5Q8ARIC

1           Again, they may have some disagreement about the

2     nature and extent of the service that they do provide, but at a

3     baseline there is no disagreement.  CloudFlare is providing a

4     service, a benefit to these defendants, or else why would

5     defendants subscribe to this service?

6           THE COURT:  That can't be the limit of what is

7     enjoined.  They might rent an office space.  They might be

8     serviced in all kinds of ways that don't bring it within the

9     scope of the injunction.  They provide a service, but the

10    question is, are they within the scope of the injunction.

11          In essence, there are two questions.  I am not sure if

12    it's any different.  Well, if it will be different down the

13    road versus different now, there is a question of whether they

14    are bound by the existing TRO, and, therefore, assuming you

15    prevail through default or otherwise on the permanent

16    injunction, will they be bound.

17          Then I suppose there is a separate question of

18    whether -- that's the question.  That's the question.

19          MR. DOROSHOW:  Right.  Although, your Honor, the

20    difference here is, setting aside whether they were bound by

21    the TRO as it issued on the 13th, they are now with complete

22    knowledge of the TRO and its existence, our claims, the nature

23    of this Web site.  It is, by its very existence, infringing.

24    Its express purpose is to infringe.  CloudFlare is fully on

25    notice of all of this.  At that point, the continuation of

20

F5Q8ARIC

1    providing services to this blatant infringer is aiding and

2    abetting that infringement.  It allows that service to continue

3    on the grooveshark.li domain.  It optimizes the service for the

4    benefit of the users who use the Web site to infringe.  And

5    CloudFlare now, doing that with knowledge, is aiding and

6    abetting.

7          We had cited to your Honor a decision from Judge

8    Hellerstein in the North Face v. Fujian case where he found,

9    not someone as closely connected to the defendants as

10   CloudFlare is, but rather the operator of the registry that

11   administers the dot org domain, which is a company called

12   Public Interest Registry, which is in Virginia.  And Judge

13   Hellerstein concluded, properly so, that once Public Interest

14   Registry was on notice of the court's order, its continuing

15   provision of even that detached service of allowing the domain

16   name to exist in the registry was aiding and abetting, and the

17   Public Interest Registry was ordered forthwith to cease and

18   desist from that.

19         Here, CloudFlare is much more directly connected to

20   the defendants than the Public Interest Registry, which had no

21   contractual relationship with the Web site; they simply

22   administered the top-level domain more generally.  Here,

23   CloudFlare has a customer.  It is the defendants.  The

24   defendants had a contractual relationship with CloudFlare.

25   There is a very specific and targeted relationship.  So for

SOUTHERN DISTRICT REPORTERS, P.C.

F5Q8ARIC

1    CloudFlare to continue that relationship with knowledge of all

2    of this -- our TRO, our claims, the likelihood of success that

3    we have already established, and the irreparable harm that we

4    continue to suffer every single day -- we submit, your Honor,

5    that's aiding and abetting, and therefore fully within the

6    scope of a TRO.

7             THE COURT:  Mr. Harrington, I will give you a chance

8    in one moment, but Mr. Doroshow, are you aware of CloudFlare

9    having previously been enjoined?

10            MR. DOROSHOW:  Yes, your Honor, at least in one

11   decision.  There may be countless others that we haven't seen,

12   but there is a decision, a Westlaw decision.  I can read into

13   the record the citation for you.  The case is called DISH

14   Network LLC v. Dillion.  The Westlaw citation is 2012 WL

15   368214, and that was a decision of the Southern District of

16   California, February 3, 2012.

17            THE COURT:  That specifically enjoined CloudFlare or

18   it was deemed a comparable order, like the one issued by Judge

19   Batts here was deemed to apply to CloudFlare?

20            MR. DOROSHOW:  It specifically names CloudFlare, and

21   it enjoins them in their capacity as a Web site optimization

22   company, which is precisely what they are performing here.

23            THE COURT:  This is just a procedural question.  If

24   you were to bring a separate action naming CloudFlare and seek

25   a TRO with respect to them here, you think that's the same

SOUTHERN DISTRICT REPORTERS, P.C.

F5Q8ARIC

1   question as to whether the existing TRO applies in light of
2   their notice now or what?
3          MR. DOROSHOW:  Not necessarily, your Honor, and we are
4   reserving on the question of whether to name CloudFlare as a
5   party.  But in terms of the scope of their knowing contribution
6   to this Web site, it certainly meets the standard of what is
7   enjoinable under Rule 65.  Standing here today I don't want to
8   equate the standard for Rule 65, the scope of permissible
9   injunctions under Rule 65 as a liability standard.  I don't
10  know if they are coextensive.  I don't think they need to be.
11  But even if they were, I would submit that CloudFlare meets
12  even that heightened standard given their knowledge and the
13  nature of the service that they provide.
14         THE COURT:  Mr. Harrington, do you want to make a
15  point?  I will hear that point and then I am just going to ask
16  each of you -- what I hear at base, Mr. Harrington's request is
17  to give them a few days to put in a broader opposition paper.
18  I will hear plaintiff on their view of that.  Then I will also
19  just sort of hear generally your proposal on how to proceed
20  beyond that.
21         Mr. Harrington, you wanted to respond to something.
22         MR. HARRINGTON:  Yes.  I just briefly wanted to state
23  that the test for an injunction is whether CloudFlare is in
24  active concert or participation with the defendants, and it's
25  our contention that the kind of service that we are providing

F5Q8ARIC

1    is one that doesn't meet that test.  But ultimately all we are

2    asking for here today is to give us the time that we request,

3    until Monday, a week from today, to provide additional briefing

4    and to give your Honor enough context to hopefully appreciate

5    our point, which is that the issues are not as simple as they

6    might seem in plaintiffs' papers.  We understand plaintiffs are

7    eager to pull in any third parties that might help them end

8    what they are trying to stop, but it's our view that CloudFlare

9    is not the kind of third party that should be brought into this

10   sort of dispute between plaintiffs and the defendants in the

11   action, and there are important legal principles at stake that

12   we would like to fully brief.

13              THE COURT:  You're asking until when?

14              MR. HARRINGTON:  Until Monday, June 1.

15              THE COURT:  Until June 1.

16              Are you willing to consent to a TRO until that time?

17              MR. HARRINGTON:  My client's position is that as a

18   kind of neutral service provider on the Internet, its

19   relationship with its clients, not these defendants in

20   particular but all of its clients, is very important, and the

21   fact that they will go through legal process to protect both

22   CloudFlare's rights and whatever rights their customers might

23   have not to have CloudFlare brought into their action is

24   important.

25              If this were an injunction matter involving an effort

SOUTHERN DISTRICT REPORTERS, P.C.

24

F5Q8ARIC

1   by a landlord to get someone out of a house and the water

2   company came in because there is an injunction to try and stop

3   servicing water to the house, the water company wouldn't

4   consent to a TRO because they have important legal principles

5   they need to defend.  It's our position here that we need to do

6   that as well.  We need to fully brief and litigate the issues

7   because we don't think it is appropriate that the type of

8   service that we provide on the Internet is one that is subject

9   to an injunction in a private dispute between parties over

10  infringement.

11          THE COURT:  Mr. Doroshow.

12          MR. DOROSHOW:  Your Honor, a couple of things there.

13          We obviously are seeking immediate relief here.  A TRO

14  is important to us for all the reasons we said at the beginning

15  of this case back on May 12.  To delay the briefing until June

16  1, and perhaps a hearing after that, also would put us on a

17  totally separate track than we are already on with respect to

18  the defendants.  As your Honor noted earlier, the defendants

19  are ordered to file any response papers on May 29, this week,

20  and the hearing is then June 3.  So we will be on a staggered

21  track which complicates matters for us.

22          More fundamentally, in the meantime we continue to

23  suffer irreparable harm on a growing basis.  The site continues

24  to grow in popularity.  CloudFlare continues to provide its

25  name server resolution service.  It's how people are connected

SOUTHERN DISTRICT REPORTERS, P.C.

F5Q8ARIC

1    to the site.  In addition to these other services, CloudFlare

2    routes all traffic -- other than the download of individual

3    sound files, all traffic to and from that Web site is routed

4    through CloudFlare to this Web site.  CloudFlare is an integral

5    part of this service, and to allow it to continue to provide

6    that service, even as we litigate these issues, which we submit

7    are not nearly so difficult as CloudFlare suggests they are, we

8    would continue to suffer irreparable harm.

9            THE COURT:  You learned from CloudFlare on May 14 that

10   they saw themselves as not needing to comply, right?

11           MR. DOROSHOW:  On May 14 is when we made contact.  May

12   15 we had a telephone conversation.

13           THE COURT:  In any event, you took a week between then

14   and when you came to court seeking orders from me.

15           MR. DOROSHOW:  Yes.  And there is a reason why we took

16   that interim step.  When we notified CloudFlare, the site had

17   moved from grooveshark.io to grooveshark.vc.  Only over the

18   weekend was there a subsequent move from grooveshark.vc to

19   grooveshark.li.  That happened on Sunday, the 17th I believe.

20           At that point, this past week, only then did we

21   realize CloudFlare not only had no intention of complying with

22   the order, but that they would continue to supply name server

23   resolution to yet another site, because there was another

24   configuration of another name server after we had already

25   spoken to CloudFlare.  So that grooveshark.li site would

SOUTHERN DISTRICT REPORTERS, P.C.

26

F5Q8ARIC

1     resolve through CloudFlare's name server to an IP address.

2          So, essentially, on Monday of that week we realized,

3     OK, there is now a Web site that is being administered overseas

4     in Switzerland.  And now we know that CloudFlare is going to

5     continue to provide name server resolution, notwithstanding the

6     notice we have given them, that's when we took action.  And in

7     order to prepare these papers, it took us a couple of days to

8     get them before your Honor.

9          THE COURT:  OK.  In any event, you had about a week.

10         I am just thinking through the schedule.  I am not

11    sure what to do about the lack of a parallel track with the

12    underlying action.  It seems as if no one is coming in that in

13    any event.

14         There's two ways to proceed.  I suppose there's three

15    ways to proceed.  I can decide on what is in front of me, but

16    given that CloudFlare is here and they were only served these

17    papers on Friday -- is that right?

18         MR. HARRINGTON:  Yes.

19         THE COURT:  -- I am going to give them a few days to

20    put in some briefing.

21         So, one possibility is I give them a couple of days to

22    put in some briefing while I am looking at the issue, and I

23    will get something out as quickly as I can, but after giving

24    them a chance to put something fuller in.  I am not talking

25    about June 1.  I am talking a few days after today.

SOUTHERN DISTRICT REPORTERS, P.C.

F5Q8ARIC

1          MR. DOROSHOW:  If I may, one point on that.  The other

2     factor to consider as well in the TRO context is, of course,

3     the balance of harm.  In our view, we see zero harm to

4     CloudFlare if they were enjoined in the interim period, from

5     today going forward, whereas the harm to us is obvious.

6          CloudFlare talks about their position with respect to

7     other customers; they service other legitimate Web sites and so

8     on.  We are not talking about those Web sites.  We are talking

9     about a single Web site that is inarguably violating the law

10    openly.  And for them to be able to continue to provide service

11    to that particular Web site, while we wait for briefing to

12    occur, again, we just don't see how the balance of harm could

13    be weighed in any way other than decidedly in plaintiffs'

14    favor.

15         THE COURT:  That might well be true, but it's a bit

16    the cart before the horse.  There just is not a basis to

17    proceed without giving them an opportunity to be heard, which

18    they are plainly being given.  As I said, I am talking about a

19    few days.

20         I do think CloudFlare has a choice to make.  We can do

21    this in a very quick posture, which means you're going to have

22    to put something in -- in my head it's a question of whether

23    it's two days I think at most -- and then I am going to decide

24    it very quickly.  Maybe that's fine for you.  Then maybe we

25    come back 14 days later and we have a full-blown PI hearing,

F5Q8ARIC

1    but there will already be a decision on the books making an

2    assessment of likelihood of success on the merits.  Or you

3    consent to a TRO until we have an opportunity for full

4    briefing, a factual hearing, if that's what we are talking

5    about, and we do this in a much more deliberate mode.  And I

6    don't see, frankly, why your customers wouldn't perceive that

7    as fighting just as hard for the principle as something else.

8    I think that's the choice.

9             MR. HARRINGTON:  I did discuss this with the client.

10   If I could propose perhaps a short break just to speak to my

11   client about it, but I am at this point fairly confident,

12   unless having listened to the argument they have a different

13   view, that their view would be they prefer to work harder and

14   brief the issue faster, and also perhaps without the benefit of

15   the two weeks and full hearing without a TRO.  But if the Court

16   would give me the chance, I will reach out and talk to them.

17            THE COURT:  I will adjourn for a moment and come back.

18   I do think that's what we face.  I think the irreparable harm

19   argument that was just raised, I didn't hear you articulate, at

20   least here, what that would be.  There is already, obviously, a

21   determination that's been made of irreparable harm and

22   likelihood of success on the infringement and the like.  I hear

23   you that there is a legal issue that needs to be resolved.

24            So the TRO is going to be one posture.  A more full

25   record might be another.  I will do one of the two.  You let me

F5Q8ARIC

1    know.  And whichever it is, once you talk to your client, come

2    back and confer with opposing counsel, and whether it's door

3    number one or door number two, what the proposal is for timing,

4    and I will come back in about five minutes.

5          Thank you.

6          (Recess)

7          THE COURT:  Mr. Harrington.

8          MR. HARRINGTON:  I did consult with my client, and as

9    I predicted, I think our preference is to have an expedited

10   briefing and hearing schedule rather than consent to a TRO.  I

11   have discussed it with plaintiffs, and we were thinking of

12   proposing a Monday hearing, if that works for your Honor, with

13   briefing prior to that.  So a brief by us and a reply brief by

14   plaintiffs.  We haven't yet settled on dates and times for

15   those briefs.

16         THE COURT:  All right.  What do we think we need to do

17   at the hearing?

18         MR. HARRINGTON:  I think from our perspective we would

19   probably need to call at least one witness who can describe for

20   your Honor what CloudFlare's system is and how it fits into the

21   broader context and answer whatever questions your Honor has

22   about that.

23         THE COURT:  What do you think, Mr. Doroshow?

24         MR. DOROSHOW:  Your Honor, it is quite complicated.

25   If we are going to have expert witnesses, we will need our own,

F5Q8ARIC

 1    and this becomes more of a full-blown factual investigation,

 2    and all the while, as I have said, we continue to be

 3    irreparably harmed.

 4            We are trying to be as accommodating as we can, but we

 5    are in a very difficult spot here.  We feel like we need and

 6    are entitled to immediate relief, and if we are going to have

 7    to allow the process to go forward with competing experts on

 8    factual issues, it really puts us in a difficult spot.

 9            THE COURT:  That's true, but I can't just take what

10    you say as a factual assertion and assume it to be true if

11    there are contested facts.

12            Here is what I think.  I don't think it makes sense to

13    do an actual full-blown hearing and then two weeks later do it

14    again.  It just doesn't make any sense.  So my suggestion would

15    be, I am going to let them put in papers, including their

16    factual declarations, which can compete with yours.  I don't

17    think there are credibility issues to be made out, at least for

18    purposes of a TRO.  If they say something factually different

19    about their technology than what you say, I am going to have to

20    sort out what matters with that for purposes of the TRO.

21            If what they are saying is things you're saying and

22    the relief you're seeking is contingent on facts which aren't

23    true, I can't just, because you're saying you're going to be

24    irreparably harmed, go ahead and grant it, but maybe these

25    facts don't matter.  I don't think it makes sense to do what it

F5Q8ARIC

1   sounds like might be required for the preliminary injunction

2   stage at the TRO stage.

3           I think everybody is shaking their heads in agreement.

4   So I will hear you, but my proposal would be to give CloudFlare

5   two days to put in opposition papers, and then I will decide

6   the TRO.  Then if anyone really thinks we need a full-blown

7   hearing on a PI after that, I will bring you in quickly after I

8   issue my order and we can figure out what needs to happen next.

9           MR. HARRINGTON:  We can prepare papers like that.

10          What I would just mention is in the event the Court

11  feels that having read the papers it would be helpful to hear

12  from someone at CloudFlare who is an expert, in a sense, that's

13  something that we are obviously amenable to.

14          THE COURT:  It's their burden.  It's the plaintiffs'

15  burden to prove what they need to prove to show that you're

16  implicated in the existing TRO.  You want to do that

17  immediately.  They want immediate relief, obviously, and they

18  may well be entitled to it.  I am giving you a chance to be

19  heard.  I hear you.  So you agree to that, Mr. Harrington, and

20  you're offering it if I have questions.

21          Mr. Doroshow.

22          MR. DOROSHOW:  Just to clarify, once we receive the

23  papers that they are going to submit in two days, if we feel a

24  need to reply, will we have an opportunity to do so, inform the

25  Court of our intention to reply?

SOUTHERN DISTRICT REPORTERS, P.C.

F5Q8ARIC

1           THE COURT:  You would get a reply.  In the meantime I
2    am going to decide it.  I am going to move as quickly as I can
3    given your indication of the need for relief.  But if you would
4    like a day to reply, that's fine.
5           MR. DOROSHOW:  Thank you, your Honor.
6           THE COURT:  And you agree, Mr. Doroshow, we will do
7    this on the papers, and hopefully we will reach the point of
8    resolution, but if we need to do it again in a preliminary
9    injunction context, permanent injunction context, we can come
10   in quickly and figure out what needs to be done.
11          MR. DOROSHOW:  Yes, your Honor.
12          THE COURT:  So today is May 26.  CloudFlare's papers
13   on or before May 28.  I am actually going to say 3 p.m.  Then
14   any reply, if it's coming in, by 10 a.m. on the 29th.
15          MR. HARRINGTON:  Because my co-counsel is in the West
16   Coast, if 3 p.m. is what the Court wants, we will do that, but
17   if it's possible to have it a little later in the day, that
18   just might be easier for them to work through the time change
19   issues.
20          THE COURT:  I will do 5 p.m.  Then I will give the
21   reply by noon on the 29th.
22          MR. HARRINGTON:  Can I just ask you one other question
23   about the unsealing order?
24          The order that is on the docket says the case is
25   unsealed.  My understanding of that is it means the underlying

SOUTHERN DISTRICT REPORTERS, P.C.

F5Q8ARIC

1   documents, the original application and the order, are

2   therefore unsealed.  But there was a concern that maybe certain

3   documents were still under seal even though the case had been

4   unsealed.  The reason why we e-mailed the letter to the Court

5   rather than filing it is because we weren't entirely sure.

6           THE COURT:  I don't believe anything is sealed at this

7   point.

8           MR. DOROSHOW:  That's correct from our perspective.

9           THE COURT:  No one sees a reason for sealing at this

10  point, correct?

11          MR. DOROSHOW:  That's correct.

12          THE COURT:  Nothing is sealed.  It may be that there

13  is a lag in documents getting up on ECF, coming out of the

14  sealing envelopes and getting onto ECF, but everything can

15  happen on ECF now and should happen on ECF.

16          MR. HARRINGTON:  In the event there are parts of the

17  factual submission that are sensitive, should we just follow

18  the Court's individual rules on how to deal with that?

19          THE COURT:  You should.  And just know sensitivity is

20  not the standard.  I know that was shorthand, but I am a

21  stickler and will look for justification under the Second

22  Circuit's standard for doing anything under seal.

23          MR. HARRINGTON:  Thank you, Judge.

24          THE COURT:  So we have our basic schedule.  I am going

25  to encourage you to talk again and just think about whether you

SOUTHERN DISTRICT REPORTERS, P.C.

34

F5Q8ARIC

1    want to continue in this very expedited posture and think about

2    a slight delay if folks think they need more time.  This is the

3    schedule, so unless anything changes this is when I will get

4    the papers and I will put out an order very, very quickly, and

5    then we will come back if we need to.  But I want to try to

6    encourage you to think about what is overall most efficient in

7    this process.  So just reflect on whether you want to keep on

8    this path or do something different from what you think you

9    need to make out your case.  But I have a request to move

10   quickly given the allegations of harm so I will.

11           Anything else I need to address at this time?

12           MR. HARRINGTON:  Nothing, your Honor.

13           MR. DOROSHOW:  Nothing, your Honor.

14           THE COURT:  Thank you.  We are adjourned.

15           (Adjourned)

16

17

18

19

20

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.